## Commonwealth v. Benjamin et al.

*Summary conviction—Disorderly conduct—Holding Communist meeting in violation of police orders—Constitutional law—Right of assembly—Police power.*

1. An appeal from a summary conviction for breach of the peace and disorderly conduct will be dismissed where defendants, who were adherents to communistic principles, arranged for a public meeting of unemployed persons in defiance of orders from the police department, which had reasonable grounds to believe disorder would result therefrom; sent out notices of the meeting calling on all persons to "demand work or government maintenance" and "to protest against the brutal indifference of the city and State authorities;" and refused at the meeting to disperse, and used violent language in denouncing the police and the government.

2. The constitutional right to assemble in a peaceable manner does not give the right to assemble for a purpose that may precipitate a riot or to exploit the ideas of those who would destroy the Constitution if they could.

3. The police may adopt all reasonable and necessary means for the preservation of rights of persons and property from unlawful violence and disorder.

Appeal from summary conviction.  Q. S. Phila. Co., filed Feb. 17, 1928.

*David Wallerstein,* for appellants.

*John H. Maurer,* Assistant District Attorney, and *H. Eugene Heine,* Assistant City Solicitor, for Commonwealth.

ALESSANDRONI, J., July 16, 1928.—This is an appeal from a summary conviction before Magistrate Violet H. Fahnestock by each of the sixteen defendants who were fined $10 and costs after the magistrate had found them guilty of breach of the peace, Sunday violation and disorderly conduct. Upon the entry of bail and allowance of their separate petitions, an appeal was allowed.

Upon hearing *de novo,* the court has before it the following undisputed facts:

A few days before Sunday, Feb. 12th, George Evans, one of the defendants, known to William B. Mills, Superintendent of Police of the City of Philadelphia, to have very strong Communist leanings, if not an avowed Communist, called at his office and stated that he, Evans, was going to hold a meeting to protest on the part of the unemployed against certain actions on the part of city officials and to demand from City Council money for their sustenance and support. Evans was told that a meeting of this kind at this time would only bring there a number of unemployed under false pretenses and would attract the usual radical Communist followers to affairs of that kind, and was further told that he would have an answer as to whether or not the meeting would be permitted. After Superintendent Mills conferred with the Director of Public Safety, it was decided, in the interest of law and order and of the prevention of a possible breach of the peace, not to permit the meeting to take place. Instructions were accordingly issued to the police in the district where the meeting was to be held to notify the owners of the hall and others interested that the meeting would not be permitted. Evans then caused the following printed circular to be delivered to the office of the Superintendent of Police: "Unemployed Organize. Demand Work or Government Maintenance. Mass Meeting to Protest Against the Brutal Indifference of the City and State Authorities. Sunday, February 12th, 1928, 2 P. M. Machinists Temple, 13th & Spring Garden Sts. Speakers: Ben Thomas, Geo. D. Evans, Herbert Benjamin and Others. Unemployed Men and Women come in masses to this meeting. Organize your forces for effective action to secure consid-

eration of your needs and immediate adequate relief.    Admission Free: Auspices: Philadelphia Council of Unemployed."

The circular had the following notation on the back: "2nd Month, 8th, 1928. Supt. Wm. B. Mills. Dear Sir: Arrangements have been made for holding the Mass Meeting announced on the back hereof. Very Truly, Geo. D. Evans, Secy. Phila. Council of Unemployed. Resi. 7723 N. 16th St., Phila."

After the receipt of this circular, Evans, accompanied by his attorney, David Wallerstein, Esq., called on Superintendent Mills, who explained to them that the police would prevent the meeting. Evans replied that the meeting would be held. On Sunday, Feb. 12, 1928, Corporal Fagan informed Lieutenant John J. Cary that a meeting was to be held at No. 521 York Avenue, and that a crowd was gathering, about 3.30 o'clock in the afternoon. Lieutenant Cary, accompanied by two officers, went to that address, where he met Evans. He informed Evans that he understood there was going to be a meeting and told him, as he did not have a permit to hold it, they would not permit it, to which Evans replied: "I am going to hold it." There were then about fifteen men upstairs. Evans, raising the second-story window and calling to the people who had gathered outside to come in and not to pay attention to the police, shouted: "The mayor of the city is only a whelp, and the President of the United States. . . ." Here he was stopped by Cary. Cary then proceeded to disperse the meeting and placed some of the men under arrest. A couple of hundred people had gathered outside and the streets were blocked with automobiles. Superintendent Mills, recalled, testified that from information he had received, he anticipated that if the meeting was not held at Machinists' Temple they would go to the Communist headquarters, No. 521 York Avenue, and accordingly gave orders to the police in that district to prevent any uprising there. From this it would appear that those interested in holding this meeting, particularly Evans, brought their meeting to York Avenue to circumvent the police. Sergeant Harry A. Connoughton, acting upon orders from Lieutenant Cary, went to No. 521 York Avenue, where he interviewed Herbert Benjamin, one of the defendants, described as the president. While there he was informed by another defendant, Jennie Cooper, the secretary, that he was misinformed, that no meeting was to take place at No. 521 York Avenue, but at Machinists' Institute, 13th and Spring Garden Streets. After having reported this to his superior officer, he was directed once more to report to the place of the meeting, where he found about three or four hundred people gathered and acting in a disorderly manner. "They were shouting and talking like a person in an excited mood; and their attitude in general concerning the Mayor and the Police Department in interfering with their meeting." That he and other officers went upstairs to the meeting-room to pacify the people, "talked nice to them and had no trouble whatever, but they seemed to insist upon being arrested." That they said, "Lock us up; you cannot put us out." That all of those arrested seemed to be in the same attitude; they all wanted to be arrested. That speeches were made from the window calling to the crowd about the police interfering; that the Mayor and the police in general were against their cause. Corporal Fagan testified that he arrived at the place of the meeting about 1.30 P. M., with instructions not to allow any meeting to take place. There was no one there at that time. In a short time a number of people began to gather, among whom was the defendant, Jennie Cooper, who stated they were going to have a meeting there. She said: "They just cleaned out Machinists' Hall and we are going to have this meeting in spite of Superintendent Mills and

his police, or anyone else." She was told they could not have a meeting there. Meantime, Evans and Benjamin arrived. and instructed Michael Tuolor, another defendant, to proceed with the meeting. He also instructed the people not to move out of the place, that the police had no power to be there and that they would hold a meeting in spite of them. Tuolor proceeded to take off his hat and coat and started to denounce the police. After that, Tuolor lifted up the window and made a speech exhorting the workers to come in and have their rights; every one to come to the hall and defy the police. As the witness went upstairs to stop Tuolor, Benjamin and Evans joined in the speech-making, "denouncing" the President and the Mayor; talking about "the Mayor down-trodding them." Meantime, another one had reached the window to make another speech. About this time the streets were blocked, automobiles could not pass, automobile horns were blowing and the people outside were being exhorted to come in and defy the police. Officer Hagan, who arrived shortly after 3 o'clock, testified that there were about 700 people outside the building at about 3.17 P. M. Officer Schwenck, testifying generally in corroboration of the other police witnesses, stated that the people were "hollering and creating a crowd," and that he arrested the defendant, Israel Lazar, after he warned him against trying to force his way through the crowd into the meeting. Officer Roth said that he arrived on the scene at 2.15 P. M. He was there with Lieutenant Cary, and the latter informed Evans the meeting would not go on. That Evans replied: "Huh, you will not stop us." "Who the hell do you think you are because you have that uniform on?" That some one yelled out of a window: "Don't let the officers hinder you from coming in the building; they are only Mackey's slaves; you vote and give people big jobs in the City of Philadelphia, and what for—the dirty Commonwealth." The defendant, Irvin Sheves, was arrested by this officer for refusing to leave the hall. He had a "package of literature on disarming and a conference of the labor class of people." Officer Lowry, arriving there at 3.15 o'clock, arrested Jennie Cooper, who was standing on the front steps shouting, "This is a fine democracy." Fannie Cutler and Mary Grossman were also placed under arrest when they refused to disperse. On being told they would have to be put in the wagon [if] they wouldn't move on, they answered: "That is what we want." Clara Yampolsky was arrested for refusing to obey the police order to remain outside the hall. George Reuss was arrested for interfering with the police in making arrests. Officer Pflugfelder testified that as Fannie Cutler and Mary Grossman were being arrested, Fannie Cutler said: "This is fine democracy; a fine country to live in; you are fine officers, you are." Peter Pedlinsky, Nicholas Krystalowych, John Horne, Emanuel Epstein and Oscar Ovrutsky were arrested for refusing to leave the hall after Lieutenant Cary told them to go. There was no testimony affecting Lema Hoffman. This defendant was ordered discharged at the hearing of the appeal.

The defendants contend that the convictions should be set aside because

1. They violated the provisions of section 20, article I of the Constitution of Pennsylvania.

2. That the Commonwealth failed to show that this was an unlawful assembly..

3. That no breach of the peace was committed, and if there was one, it is doubtful that there is such an offense in Pennsylvania.

4. The defendants were not guilty of disorderly conduct.

5. That there was no violation of the Act of April 22, 1794, commonly known as the Sunday Law.

Commonwealth v. Benjamin et al.

An examination of the record fails to disclose any testimony showing a violation of the Act of April 22, 1794, 3 Sm. Laws, 177. There are only two questions in this case: First, did the Superintendent of Police have the authority, in the exercise of his discretion, to refuse defendants permission to assemble under the circumstances? Second, did the acts of all, or any, of the defendants, when requested peaceably to leave the meeting-place, constitute a breach of the peace or disorderly conduct? The right of the State, in the exercise of its police power, to enact laws, ordinances and regulations to preserve itself and to protect its citizens has never been held to violate any of the provisions of the Constitution. The constitutional right of citizens to assemble together in a peaceable manner and for the common good, etc., does not mean that citizens have a right to assemble for purposes which may precipitate riot and disorder, however innocently or plausibly the sugar-coated purpose for police consumption may be declared. Constitutional rights safeguarding the rights of citizens should be invoked in the spirit of its authors and not as a cloak for the exploitation of the ideas of those who would destroy it if it lay in their power to do so. It is a commonplace that its worst enemies are the first to invoke the mantle of its protection. Surely, learned counsel for the defendants cannot mean that municipal authorities are without power to interfere and to prevent a proposed assembly of men potentially injurious to the peace and order of the community, nor can it be denied that one of the primary functions of government is to preserve order. Isn't this duty discharged more in the prevention than in punishment? What would become of the right of citizens to assemble in a peaceable manner if order was not established in the first place? The sight of the uniformed patrolmen (so obnoxious to the defendants in this case) on the public highways acts as a deterrent to the criminally minded. It would be utter folly to say that it were time enough for the police to put in an appearance and intervene when a disorder was actually precipitated or a crime committed. It is said by the defendants that the police acted illegally, because without authority of any statute or ordinance, in refusing permission to assemble. We have found no authority for this proposition. Legislators have enacted laws and municipalities have passed ordinances regulating the conduct of those charged with the maintenance of peace and order. But the source of the duty to preserve order goes much beyond that legislation. It is rooted deeply in our common law and reserved specifically in decisions without number on questions of constitutional law in the states and its political subdivisions. In Wilkes-Barre v. Garabed, 11 Pa. Superior Ct. 355, the court said:

"The State, by the organization of cities, imparts to its creature, the municipality, the powers necessary to the performance of its functions and to the protection of its citizens in their persons and property. . . .

"City councils, under the police power, may delegate to an officer like the mayor authority to carry out the will of the corporation in the dispatch and control of daily affairs and the preservation of the public peace. The only limitation of this power is that it must be exercised in a reasonable, lawful and constitutional manner."

In Jefferson Coal Co. v. Marks, 287 Pa. 178, the Supreme Court says: "Undoubtedly, unless restricted by police powers exerted through cities, boroughs and townships, people have an unrestricted right to assemble on highways or parade through the streets, unless their acts are inimical to public good or the safety and peace of the Commonwealth would be disturbed thereby." See Duquesne City v. Fincke, 269 Pa. 112. While it is true that

the question involved there was the right of a citizen to use the public highways for purposes of a meeting, Justice Simpson restated the fundamental principle that "The 14th Amendment to the Constitution of the United States does not destroy the power of the states to enact police regulations as to the subjects within their control, . . . and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the Constitution and laws of the State" (quoting from Davis v. Massachusetts, 167 U. S. 43). It was held that Fincke did not have the right, under section 20 of the Pennsylvania Bill of Rights, to assemble with others and to speak on the highway. The ordinance was not found to be in conflict with section 20 of the Constitution of the State. It does not avail to say that this case is distinguishable from the instant case, because it was shown there that the meeting proposed was to be on the highway, and here within a building. The Fincke case confirms the right of the municipality to regulate the conduct of its citizens in face of the constitutional guarantee of the right of peaceable assembly.

"The preservation of the public peace and order is the primary police function of a municipality. Whatever contentions may have arisen over municipal police power, the authority to preserve the peace and order of the municipality, to prevent the exercise of unlawful violence and to compel citizens and sojourners to abstain from riot, rout and unlawful assembly is regarded as an inherent municipal power essential to municipal life:" 28 Cyc., 707.

The new Charter Act, entitled "An act for the better government of cities of the first class of this Commonwealth," P. L. (1919) 581, 582, article II, section 6, subdivision v, provides: "It shall be the duty of the mayor to perform such duties as may be prescribed by law or ordinance, and he shall be responsible for the good order and efficient government of the city."

For obvious reasons, the duty of maintaining the public order is delegated to the Director of Public Safety. The few words quoted from the act are sufficiently comprehensive to constitute a delegation of power to the Mayor and his Director of Public Safety to maintain peace and order: "It is the duty of the police power to adopt all measures necessary for the preservation of the rights of person and property from unlawful violence and disorder, and for the maintenance of peace and quiet." See, also, Northumberland County v. Zimmerman, 75 Pa. 26.

The only limitation of this power is that it must be exercised in a reasonable, lawful and constitutional manner. We have already discussed the latter two of the three limitations. The next question, therefore, is: Was the exercise of the power by the police reasonable? The factors involved in a proposed meeting of the kind intended by the defendants and its potentiality for disturbing the public peace are peculiarly within the province of the police authorities. They know, or should know, men, conditions, the state of the public mind and the probable outcome of the combined action of men under prevailing conditions. This they are qualified to do by special training and experience and upon them falls the responsibility of determining whether a proposed meeting is inimical or not to the public good, peace or safety of the community. They may, in this connection, exercise a discretion with which the courts have no power to interfere, except where an abuse of it has been shown: Theatre Co. v. Weaver, 33 Pa. C. C. Reps. 241; 15 D. R. 794. It is not necessary to review the facts of this case to establish the reasonableness of the power exercised by the police. There was a very general condition of unemployment. Under the leadership of George D. Evans, known to the police to have

Commonwealth *v.* Benjamin et al.

strong Communist leanings, if not an avowed Communist, a meeting was to be held to demand from City Council money for their sustenance and support. The circular used, calling the unemployed together, was an appeal for mass action: "Demand Work or Government Maintenance. . . . Organize your forces for effective action to secure consideration of your needs and immediate adequate relief. . . . Auspices: Philadelphia Council of Unemployed." No comment is needed to describe the probable effect of such an appeal to men undergoing the suffering and hardship of unemployment. If, in the honest and sincere belief of the police, there resided in such a meeting a real probability of a disturbance of the public order, it was their duty to prevent the meeting: Theatre Co. *v.* Weaver, 33 Pa. C. C. Reps. 241. Every metropolitan centre harbors a negligible number of persons whose only claim to a questionable distinction is the exploitation of every opportunity for stirring up the emotions of one class or another; under this or that pretext, to exhibit their intolerance of the existing form of government and to procure recruits for their particular formula of social regimentation. To these, it is sufficient to set a movement under way. The greater the noise, disturbance and public derangement, the better. With the possible consequences to the community and to the individual they are not concerned. There is no more propitious time for the execution of so ignoble a program than during a season of unemployment.

The next and final question is, were the defendants guilty of a breach of the peace or of disorderly conduct?

Having before us the events that took place, the defendants may be divided into two classes: Those who committed acts which, under the circumstances, constituted a breach of the peace, or such as tended toward it, and those who were placed under arrest because of their failure to leave the meeting-place. In the former class are George D. Evans, Herbert Benjamin, Mike Tuolor, Jennie Cooper and Fannie Cutler. It was the conduct of these that, under the circumstances, was disorderly and deliberately calculated to precipitate a breach of the peace. It was the actions and words of these that created an attitude of defiance in those already in the hall and caused the gathering of the crowd outside, numbering from 200 to 700 people. It was due to no virtue of this group nor to the moderation of their language that the assembled crowd did not attack the police. It is quite clear that they intended to carry out their plan regardless of the consequences. "An offense against the public peace may consist either of an actual breach of the peace or doing that which tends to provoke and excite others to do it:" Updegraph *v.* Com., 11 Sergeant and Rawle, 405. In 4 Clarke, 17, upon an indictment for inciting a breach of the peace, Gibson, J., said: "No man has a right to trifle with the feelings of any large class of men so as to provoke them to a breach of the peace."

As to Peter Pedlinsky, Nick Krystalowich, Irvin Sheves, Oscar Ovrutsky, Clara Yampolsky, Israel Lazar, Mary Grossman, Emanuel Epstein, George Reuss and John Horne, we find the evidence insufficient to sustain a finding of a breach of the peace or disorderly conduct. As to these, as well as Lema Hoffman, the appeal is sustained and the conviction set aside.

The appeals of George D. Evans, Herbert Benjamin, Mike Tuolor, Jennie Cooper and Fannie Cutler are dismissed and the conviction sustained.

*Order.*

And now, to wit, this 16th day of July, 1928, pursuant to the opinion in the above case, the court finds Peter Pedlinsky, Nick Kyrstalowich, Irvin Sheves,

Oscar Ovrutsky, Clara Yamplosky, Israel Lazar, Mary Grossman, Emanuel Epstein, George Reuss, John Horne and also Lema Hoffman not guilty of the charges of violating the Act of April 22, 1794, 3 Sm. Laws, 177, disorderly conduct and breach of the peace. George D. Evans, Herbert Benjamin, Mike Tuolor, Jennie Cooper and Fannie Cutler are found guilty of disorderly conduct and each of them is sentenced to pay the costs of prosecution and to forfeit and pay a fine of $10.