## Henderson v. The Cambria Smokeless Coal Company

*Carl A. Belin,* for plaintiff; *Liveright & Smith,* for defendant.

SMITH, P. J., September 25, 1934.—This case arises as follows. The plaintiff sues for his wages as a miner earned at the mine of the defendant during the period from November 1 to November 15, 1933, amounting to $24.24, from which he admits there are proper deductions for smithing, supplies, a safety lamp, store order, check-off and check-weighman amounting to $9.09, leaving him a balance due of $15.15. The affidavit of defense admits the correctness of this claim, but sets up a further deduction of $6 as a fine for striking in violation of the wage contract. The plaintiff has filed a reply to the defendant's new matter containing the averments of fact with reference to the fine, raising the question of law that the fine is not collectible for reasons hereinafter discussed.

The first question presented is one of practice, that is whether or not the legal question is properly raised by means of the plaintiff's reply to new matter. In our opinion, a reply to new matter is not the best method to raise such questions. The practice act provides for the plaintiff's reply to a set-off or

counterclaim which is pleaded. It does not provide for such plaintiff's reply where the defendant merely pleads facts constituting new matter as a part of his defense, in which case we believe the legal questions involved would be more properly and certainly more effectively raised by a motion for judgment for want of sufficient affidavit of defense. In this case, we deem the item under controversy a mere item of credit claimed under a contract and not a claim of set-off. However, we think it unnecessary to decide this question of practice, as the legal question is in any event brought before the court by the reply, and in the event of a decision favorable to the reply the court could and would entertain a motion, after opinion filed, for judgment for want of a sufficient affidavit of defense in accordance with such opinion. We will therefore consider the legal question as properly before the court and proceed to the consideration of its merits.

In pursuance of the provisions of section 7(b) of the National Industrial Recovery Act of June 16, 1933, 48 Stat. at L. 195, a contract known as the Appalachian Agreement was entered into September 21, 1933, between Northern Coal Control Association and Smokeless & Appalachian Coal Association of the first part and International Union United Mine Workers of America and various districts, including district no. 2 thereof, "and on behalf of each member thereof" of the second part. This agreement provided for conditions of employment in coal mines in the territory of these associations, whose membership embraced respectively the employers and employes therein. This agreement contemplated further contracts in the several districts between the employers and employes. In pursuance thereof, an agreement was made September 23, 1933, between Eastern Bituminous Coal Association and United Mine Workers of America, District No. 2, which provided more specifically the conditions of employment, scale of wages, and other similar matters for the mines in said District No. 2. On October 16, 1933, a supplemental agreement between Eastern Bituminous Coal Association and United Mine Workers of America, District No. 2, to the agreement of September 23, 1933, was entered into, dealing with two subjects, check-off and penalty. It is under the penalty provisions of the supplemental agreement that the question here involved arises. All the agreements mentioned were duly executed on behalf of the operator associations and also on behalf of United Mine Workers of America, which is an unincorporated association, and its branch constituting District No. 2. District No. 2 contains the County of Clearfield, in which is located the mine involved in this proceeding. The first agreement mentioned, namely the Appalachian Agreement, was approved by the President of the United States as being in furtherance of the Code of Fair Competition for Bituminous Coal Industries, which had previously been approved by executive order.

The Eastern Bituminous Agreement contains the following provision for the settlement of disputes arising between employers and employes about the coal mines, these provisions being also substantially as provided for in the Appalachian Agreement:

"Should differences arise between the operator and the mine worker as to the meaning of the provisions in this agreement or about matters not specifically mentioned in this agreement, there shall be no suspension of work on account of such differences, but an earnest effort shall be made to settle such differences immediately;

"First, between the aggrieved party and the mine management;

"Second, through the management of the mine and the mine committee;

"Third, through the mine management or their representative and a representative of United Mine Workers of America.

"Should the third method fail, the matter shall be referred to a permanent board of arbitration consisting of two mine workers or their representatives and two operators or their representatives. They, jointly failing to agree, shall refer the matter to a permanent umpire to be selected jointly by the operators and United Mine Workers of America, District No. 2."

Under the supplemental agreement in the eastern bituminous field, the operators agreed to what is known as the check-off, that is, the collection by the operator from the individual miner of his dues to the union, with certain limitations, as well as deduction for store bills and other legitimate accounts made deductible by proper action of the employes. It also contained the following provisions:

"Should any officer or officers of United Mine Workers of America, or any member or members thereof employed at any mine, cause the mine or part of the mine to shut down in violation of this agreement, each member of United Mine Workers of America employed at said mine, except those who continue at work, shall have deducted from his earnings the sum of $1 per day for each day or part of a day the mine remained idle."

Prior to the execution of the scale agreements involved, the Coalport Union (No. 1402), of which the plaintiff was a member, under date of July 31, 1933, appointed as its "agents the international officers of United Mine Workers of America, viz., John L. Lewis, Philip Murray, and Thomas Kennedy; and the officers of District No. 2, United Mine Workers of America, viz., James Mark, Richard Gilbert, John Ghizzoni, and any additional person or persons they may appoint, with full authority to act as 'our representatives in the drafting and negotiating of any scale or code to govern our wages, working hours, and conditions of employment."

The affidavit of defense avers that the plaintiff, as well as other members of the Coalport Local Union, made himself liable to the fine imposed by the supplemental agreement by striking for a period of 6 days, and thus interrupting the operation of the defendant's mine in Coalport during that period, without having first resorted to the arbitration method of settling disputes provided for in both the Appalachian and Eastern Bituminous Agreements. The whole question therefore is whether such fine is legally collectible.

The plaintiff contends that he is not bound by the provisions of the wage agreements in question, particularly the supplemental agreement, because he did not give specific authority to the officers of United Mine Workers to enter into such a contract. We do not think this contention is sound. The plaintiff, along with others in the same occupation, sought the benefits of collective bargaining, for which reason, among others, they belonged to United Mine Workers; the local association of which he was a member, by action which he does not disavow, expressly constituted the National and district officers its agents for the purpose of making contracts governing the conditions of employment in the district. No attempt was made in the appointment of the agents to delineate their authority with exactness, but manifestly it was to cover the general scope of wages and conditions of employment and relations between employers and employes generally. No revocation or subsequent limitation of such authority appears, and the supplemental agreement was executed within such a short time after the original Eastern Bituminous Agreement as to be virtually a product of the same series of negotiations, for the purpose of which the agents were appointed. The authority conferred by any such agents would include the powers exercised customarily in such negotiations. It is a well-known matter of industrial history in this bituminous mining region that scale agreements of the same general nature as those involved here have been nego-

tiated by officers of United Mine Workers for their members for a period of more than thirty years past, and that since 1917 all such scale agreements have contained in substantially the same form the penalty clauses included in these agreements. Under the ordinary principles of agency, therefore, the plaintiff cannot be heard to complain that the officers of the National and district union exceeded the authority granted them when they included the penalty provisions in the contract.

The plaintiff also contends that he cannot be bound by the provisions of the contract because there is no averment that he expressly ratified it. This contention we think also the plaintiff cannot successfully raise. He accepted the benefits of the contract, that is, its scale of wages and its other working conditions, benefits derived for him by his resort to the system of collective bargaining through agents of his own choosing. In his statement of claim, he has expressly recognized the propriety of the deduction of the check-off which was the principal consideration, apparently, for the penalty provisions of the supplemental agreement of October 28, 1933. The check-off was of importance and benefit to him because it provided a means of obtaining with comparatively little trouble and expense the revenue necessary to maintain the union, so that it may effectively function as an agent of collective bargaining. Having accepted the benefits of the contract, it is repugnant to every sense of justice and fair dealing for him to repudiate the obligations such a contract imposes on him. Authorities are numerous to the effect that a principal cannot avail himself of the benefits of an agent's act and at the same time repudiate his authority: Presbyterian Board v. Gilbee, 212 Pa. 310; Scouton v. Stony Brook Lumber Co., 261 Pa. 241; McBride, Admin'x., v. Western Pennsylvania Paper Co., 263 Pa. 345; Danish Pride Milk Products Co. v. Marcus, 272 Pa. 340; Kujawski v. Sobelewski, 72 Pa, Superior Ct. 326.

The plaintiff's principal contention is that the penalty clause is a violation of his constitutional right to labor or to cease labor, singly or jointly with others, and to acquire the fruits of his labor. He invokes the provisions of Article I, sec. 1, of the Constitution of Pennsylvania, a portion of the Bill of Rights, and various decisions interpreting it and related provisions. He contends that this clause is an attempt to deprive the laborer of one of his inalienable rights and to delegate it to others.

The constitutional rights invoked are clear and beyond all question. They are stated in Erdman v. Mitchell, 207 Pa. 79, 90, as follows:

"The first article of the constitution says: 'That the general great and essential principles of liberty and free government may be recognized and unalterably established; we declare, that all men are born equally free and independent and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation and of pursuing their own happiness.' Then follows the conclusion of this section: 'Everything in this article is excepted out of the general powers of the government and shall forever remain inviolate.' This clause, unlike many others in the constitution, needs no affirmative legislation, civil or criminal, for its enforcement in the civil courts. Wherever a court of common pleas can be reached by the citizen, these great and essential principles of free government must be recognized and vindicated by that court, and the indefeasible right of liberty and the right to acquire property must be protected under the common-law judicial power of the court. Nor does it need statutory authority to frame its decrees or statutory process to enforce them against the violators of constitutional rights.

"The right to the free use of his hands is the workman's property as much

as the rich man's right to the undisturbed income from his factory, houses and lands; by his work he earns present subsistence for himself and family; his savings may result in accumulations which will make him as rich in houses and lands as his employer. This right of acquiring property is an inherent indefeasible right of the workman; to exercise it he must have the unrestricted privilege of working for such employer as he chooses at such wages as he chooses to accept. This is one of the rights guaranteed him by our 'Declaration of Rights;' it is a right of which the legislature cannot deprive him, one which the law of no trades union can take from him, and one which it is the bounden duty of the courts to protect. The one most concerned in jealously maintaining this freedom is the workman himself."

Also, in Jefferson & Indiana Coal Co. v. Marks et al., 287 Pa. 171, 175, it is said:

"The right of workmen to form associations for the mutual aid, benefit and protection of themselves and each other, in matters of wages and other incidental benefits, has been recognized by the courts and the legislature for many years. Our Acts of May 8, 1869, section 1, P. L. 1260; June 14, 1872, section 1, P. L. 1175; April 20, 1876, section 1, P. L. 45, and June 16, 1891, P. L. 300, recognize the right of bodies of men to combine and to refuse to work for insufficient wages, or because of inhuman, offensive or unjust treatment, and to procure others to do likewise. Such combinations have elsewhere been declared lawful. Labor unions are therefore not only legitimate but, because their aim and purpose is to better the living conditions of a large part of the body politic, they are a necessary part of the social structure. See American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 209. It is to be remembered, however, in connection with this subject, that equality of condition is impossible, but equality of opportunity for each workman is possible, and any abridgment or curtailment of this right is against the fundamental law. . . .

"While the right to form combinations, and through a strike to exert means to prevent men from working, may be lawful, it remains so only as long as the means employed are lawful. Undoubtedly, workingmen have the right to better their own condition, to abstain and have others abstain from working until they get the wages to which they feel they are entitled, but there is another right which must be recognized, with which no association of men can lawfully interfere, and that is the right of any person to work for whom he pleases, at the particular wage he pleases. A government which admits its inability to protect an honest workman in the pursuit of useful employment, simply admits its inability to function properly. This right has its corresponding right in the employer, to engage and have him work."

It is our opinion, however, that the plaintiff's contention is based upon a mistaken view of the question here involved. This is not a case, as in Erdman v. Mitchell and Jefferson & Indiana Coal Co. v. Marks et al., where the right of some person or persons to work was being interfered with by others; nor is there here any attempt to compel any individual laborer to work or, stating it conversely, to refrain from exercising his right to quit work. That the courts will not affirmatively compel any person to continue in the personal service of another is too well established to require any extensive citation of authorities: Arthur et al. v. Oakes et al., 63 Fed. 310. The question here is whether, having made a contract not to quit work in conjunction with others without first resorting to the arbitration methods prescribed and having broken the same, he is civilly liable for the penalty expressly agreed to by him in the contract. The collection of a liability for failure to comply with the terms of the labor contract is an entirely different thing from compelling the laborer to work or

refrain from work, and is not a violation of any inalienable right. Its legality depends upon whether the clause is unreasonable in character or otherwise violates some fundamental rule of public policy restricting the general power of contract. Neither the industry of counsel nor the court's own examination has disclosed any decision upon this exact question.

The plaintiff's contention, far from being in defense of the laborer's rights, would, if sustained, impose a serious restriction on his power to contract. The contracts of labor unions, as contracts generally, are deemed valid and enforcible at law between the parties thereto unless they transgress in some respect some rule of law or public policy. "There can be no doubt that a labor union when authorized by its members may make contracts in their behalf": 16 R. C. L. 425. This is necessarily true. The inalienable rights of the laborer to accept work and to acquire the fruits thereof, protected by constitutional guaranties, would be of little avail if his right to contract for his labor were surrounded with hampering restrictions. Collective bargaining, so. valuable to organized laboring men, is, like all bargaining or negotiating, a field in which the bargainer must "give" and "take", grant as well as receive concessions. To deprive him of the rights to make concessions and incur obligations is therefore to deprive him of that much power to obtain the benefits of his negotiations. Such a restriction on the power of organized labor to contract collectively as the plaintiff here contends for should not prevail unless based on the very highest and most impelling reasons.

The plaintiff points to the case of Spayd v. Ringing Rock Lodge et al., 270 Pa. 67, in support of his contention. In that case, a member of a union had petitioned the legislature, along with others, for repeal of a law highly favored by the legislative representatives of the union, and the union, claiming the right to do so under its bylaws, expelled him, thus inflicting on him the loss of valuable privileges he had acquired with his membership. It was held that, notwithstanding the bylaws, such expulsion was a violation of the member's constitutional right of petition. The distinction between that case and the one at bar is clear. There the right and duty involved were of a political nature, that of the individual citizen to exercise his political rights according to his own conscience, and not to delegate his decision in public matters to others. The right of earning and acquiring wages, however, is a right not for the public's, but for his own benefit; and the assertion or forbearance to assert such right is likewise a matter for his own judgment and discretion, with which the public should interfere only so far as necessary to maintain such right as an actuality, instead of a mere figure of speech.

When we seek for reasons of public policy why the individual laborer should not be permitted to subject himself to a fine for his failure to fulfill his contract, we find such reasons favor the freedom, rather than the restriction, of the power of organized labor to make contracts. The privilege of collective bargaining has long had the approval of public opinion, and the statutes of this Commonwealth have, since the Act of 1872, as well as by later enactment, recognized it. It has received the approval of the National Government in the National Industrial Recovery Act and its administration, in the effort to induce and assist industry to recover from the paralyzing effects of industrial depression. It is based on sound experience, both in the Nation generally and in this eastern bituminous coal region particularly, where industrial peace and stability have been promoted over a long period of time by such agreements as are here involved.

While the right to penalize by fines workmen who strike in violation of their collective contract is not absolutely essential to the right of collective bargain-

ing, it is a practical method of rendering its exercise efficient. If collective bargaining is to be effective in any field, its contracts must be made and kept in good faith. The penalty clause seeks to bring home to the union members a sense of responsibility with respect to their contracts and to discourage the so-called "outlaw" strike, with whose evils the public has had many recent experiences. The interests of employers, employes, and public are in strengthening the hands of responsible labor leadership, so that the joint problems of capital and labor may be approached in the spirit of open and frank discussion and compromise, and the results of such negotiations made effective. The lack of such responsible leadership has in many situations made for chaotic conditions and led to class warfare and industrial derangement. In no field of contract does the spirit of irresponsibility and repudiation hold so many potentialities for evil. The penalty clause appears to be a measure of self-discipline which union labor should not be denied.

The mutuality of the remedies involved also appears from examination of the contract. In it the employer surrenders some of his legal authority, for example, in submitting actions taken by him on his own premises to joint review by the mine committee and himself or by the arbitration tribunal set up in the contract. The employer also agrees to be subject to fine upon proper occasion, and he makes its collection compulsory rather than optional with him. The imposition of the penalty for violation and the agreement of the miners to submit thereto seem entirely in harmony with the spirit of the whole contract. That this is true cannot be made to appear more clearly than by quoting the provisions for fines against the employers and for collection and distribution of the fines which immediately follow the penalty clause against the miners. They are as follows:

"Should any operator or his representative lock the men out or cause the mine or part of the mine to shut down in violation of this agreement, for the purpose of forcing a settlement of any grievance, he shall be fined $1 per mine worker for each day or part of a day the mine is thus thrown idle.

"All fines provided for in this agreement shall be automatically collected, and any operator failing to collect and forward to proper parties such fine shall pay a penalty of $2 for each mine worker subject to be fined, the same to be collected and remitted to District No. 2, United Mine Workers of America. And in no case shall any fine be refunded except by mutual agreement between the executive board of District No. 2, United Mine Workers of America, and the board of directors of Eastern Bituminous Coal Association.

"All fines assessed against the mine worker under this agreement shall be deducted from the pay in the half month in which the violation occurs, or from the first money due thereafter. All fines assessed against the operator for violation of this agreement shall be collected from the operator in the half month in which the violation occurs, and shall be turned over to District No. 2, United Mine Workers of America, and all fines assessed against the mine workers under this agreement shall be turned over to Eastern Bituminous Coal Association.

"It is further agreed that if any mine worker enters suit in the civil courts to recover any fine collected in accordance herewith, District No. 2, United Mine Workers of America, shall reimburse the operator for expenses incurred on account of such suit."

The only question remaining would, in our opinion, be whether or not the penalty clause was of a reasonable character. In our opinion, there is nothing about this clause which is unreasonable. The amount seems entirely reasonable and based upon the period involved. The miner has it in his power from day to

day to terminate its imposition. It does not seem to us in any respect to be arbitrary or disproportionate, or otherwise out of a proper relation to the facts from which the penalty would arise. While designated a penalty, it seems more in the nature of an attempt fairly to liquidate the damages arising from a strike called arbitrarily and without first giving the opportunity to adjust or compromise differences.

For the reasons above stated, we think that the affidavit of defense states matters which, if proved at trial, would constitute a legal defense to that portion of the plaintiff's claim involving the penalty or fine of $6.

### Order

Now, September 25, 1934, the reply to new matter raising questions of the legal sufficiency of such new matter is overruled, and the plaintiff is granted an additional period of 15 days from the filing of this order to answer, if he so desires, the averment of facts contained in the new matter pleaded by the defendant.  From John M. Urey, Clearfield, Pa.