## Jefferson & Indiana Coal Co. *v.* Marks et al., Appellants.

*Equity—Injunction—Strikes—Picketing—Parading—Intimidation—Coal mining companies—Master and servant—Evidence—Decree.*

1. The settlement of a wage dispute is economic rather than legal, and is not for the courts.

2. When situations exist as the result of labor disputes which encroach on the safety, peace and good order of the public, or which test the nerve, courage and strength of those desiring to work, it is the duty of the courts to define the rights of the parties.

3. Workmen have the right to form associations such as labor unions for the mutual aid, benefit and protection of themselves and each other; but they have no right to abridge or curtail the equality of opportunity for each workman, for that is against the fundamental law.

4. A peaceful effort, individually, collectively or concertedly, to bring about a cessation of labor in order to enforce a demand for betterment of wages or living conditions, is not unlawful, although indirectly it may shut down a mine.

5. Hostile assemblages, marches, parades or acts of individuals, separately, collectively in combinations or under a system, which annoy or embarrass, intimidate or terrify those who desire to work, have more potency over men of ordinary nerve than actual violence, and are unlawful.

6. In such cases, a court of equity will intervene to protect persons and property by restraining such acts threatened, done or likely to be done.

7. No one can interfere with the right of any person to work for whom he pleases, at the particular wages he pleases.

8. Marching and parading intended to intimidate workmen are as unlawful as violence itself.

9. The spirit of such demonstrations is the thing to be looked for, not the mere marching on the highway.

10. The very fact that such parading is kept up day after day, or less frequently, at the time and place where men employed pass to and from their work, constitutes intimidation, and should be enjoined.

11. Where pickets are placed at intervals at places where workmen are obliged to pass in going to their work, and constantly accost the workmen, such picketing is unlawful and will be enjoined,

and especially is this so where the pickets are not themselves employees of the company working its mine.

12. Persuasion too long and persistently continued becomes a nuisance, and an unlawful form of coercion.

13. In entering a decree awarding an injunction the court should not use the word "peaceful" in connection with the word "picketing."

14. In such case, the decree should read, to restrain picketing on or near the complainant company's premises, or on the highways leading thereto, in any manner, with the purpose and for the effect of intimidating, annoying or embarrassing, or through fear exercising moral coercion over those lawfully employed by complainant, whether actual force or violence be used or not.

15. In a suit by a bituminous coal company, employing non-union men, to restrain picketing by non-employees, books and records relating to the Jacksonville wage agreement between operators and unions, are not admissible.

Argued March 15, 1926. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 46, March T., 1926, by defendants, from decree of C. P. Jefferson Co., Aug. T., 1925, No. 1, awarding injunction, in case of Jefferson & Indiana Coal Co. v. James Marks et al. Affirmed with modification.

Bill for injunction to enjoin unlawful picketing, parading and intimidation of coal miners. Before CORBET, P. J.

The opinion of the Supreme Court states the facts.

Decree for plaintiff. Defendants appealed.

*Errors assigned* were, inter alia, various findings of fact, conclusions of law and portions of decree, quoting record.

*Charles J. Margiotti,* with him *W. M. Gillespie* and *S. C. Pugliese,* for appellants.—Neither a combination to demand more wages or less hours, nor a combination to refuse to deal with those who make such demands is a

conspiracy or unlawful combination: Cote v. Murphy, 159 Pa. 420.

No stretch of imagination can bring the acts of any of these defendants within the scope of the definitions of unlawful assembly: Duquesne City v. Fincke, 269 Pa. 112; Morris Run Coal M. Co. v. Guy, 14 Pa. Dist. R. 600.

Picketing has been expressly sanctioned by the United States Supreme Court, in the case of American Steel Foundries v. Tri-City C. T. Co., 257 U. S. 184.

Peaceful picketing is expressly upheld in American Engineering Co. v. International Moulders Union, 25 Pa. Dist. R. 564.

*Raymond E. Brown,* with him *James W. Mack,* for appellee.—The injunction was properly granted: Erdman v. Mitchell, 207 Pa. 79; Murdock, Kerr & Co. v. Walker, 152 Pa. 595; O'Neil v. Behanna, 182 Pa. 236; Purvis v. United Brotherhood, 214 Pa. 348; Wick China Co. v. Brown, 164 Pa. 449; Flaccus v. Smith, 199 Pa. 128; Westmoreland Coal Co. v. McCartney, 20 Pa. Dist. R. 58; McCandless v. O'Brien, 38 Pitts. L. J. 435; Com. v. Silvers, 11 Pa. C. C. R. 481; Com. v. Redshaw, 12 Pa. C. C. R. 91; Cook & Sons v. Dolan, 19 Pa. C. C. R. 401.

OPINION BY MR. JUSTICE KEPHART, June 26, 1926:

Adrian is a small village in Jefferson County. A mining plant located there is owned by the Rochester & Pittsburgh Coal & Iron Company, a member of the central bituminous operators association. A wage scale known as the Jacksonville agreement had been entered into by it with the United Mine Workers, District No. 2. The employees at Adrian and this company were subject to that agreement. Shortly after its execution the Adrian plant closed down. It was leased to appellee, who started operations. The United Mine Workers contend that this was a palpable subterfuge to avoid the effect of the Jacksonville agreement. The mine started

on what is known as the 1917 scale. A number of their former employees returned to work at that wage. This action was resented by the members and officers of the United Mine Workers of that district. A general strike was called, when, because of conditions then existing, this bill was filed to enjoin the strikers from unlawful interference of the men at work. It was charged that forcible intercession with the men to persuade them to leave their employment took place; marches and parades, with bands of music on the public highways were of almost daily occurrence; picketing of a greater or less magnitude was engaged in; a dynamite explosion by unknown persons; threatening letters were sent and other acts were committed unlawfully, tending to persuade the men to leave work. Appellants claim that they could not be responsible for all these acts, and that they were making an effort to sustain the Jacksonville agreement as a standard of wages. The sheriff had been called on for protection, the state police appeared on the ground, and finally the appeal to the court below followed.

Appellants contend that in granting the injunction the court withdrew from the defendants their fundamental right to peacefully assemble or march on the highway, their right to picket and to accost workmen on the highway, and to induce them to quit work; it, in effect, prevented workmen from combining to preserve and maintain a wage scale. These questions are here presented to us for decision.

The basic problem involved, being the settlement of a wage dispute, is economic rather than legal. Being of this nature this court cannot settle "the multitude of questions......which agitate the public mind." No scheme in itself comprehensively sufficient has been legislatively evolved to meet like situations that has not run counter to some constitutional inhibition. It is well that judges, burdened with administering the law, should not be compelled to embark in another field of effort in which they, as a rule, are not skilled; nor have they had

the advantage of previous training therefor. Moreover, the solution of the question involved concerns not only the immediate actors, capital and labor, or employer and employee, but quite seriously the public as consumers. It is true that in somewhat similar situations administrative bodies have been created to equalize the relations flowing from contact with service that is public or quasi public. In none of these efforts has there been a direct attempt to solve the wage problem or the multitude of relations between employer and employee, though, possibly, an order may indirectly affect these questions; but even as to that we know of no case where such order has ever been made by any service commission. So far as these or any related questions are contained in the assignments of error, they must remain, as they are to-day, for the judgment of those whose duty it is to settle them without undue or unnecessary hardship to the parties or the public. If it is possible for any tribunal to take part in the settlement of them, as the question is legislative or governmental, rather than judicial, it is those departments which must act.

However, when situations exist as the result of labor disputes which encroach on the safety, peace and good order of the public, or which test the nerve, courage and strength of those desiring to work, it is the duty of the courts to define the rights of the parties. Enforced action, whether direct or indirect, will not be tolerated by the courts.

The right of workmen to form associations for the mutual aid, benefit and protection of themselves and each other, in matters of wages and other incidental benefits, has been recognized by the courts and the legislature for many years. Our Acts of May 8, 1869, section 1, P. L. 1260; June 14, 1872, section 1, P. L. 1175; April 20, 1876, section 1, P. L. 45, and June 16, 1891, P. L. 300, recognize the right of bodies of men to combine and to refuse to work for insufficient wages, or because of inhuman, offensive or unjust treatment, and to procure

others to do likewise. Such combinations have elsewhere been declared lawful. Labor unions are therefore not only legitimate but, because their aim and purpose is to better the living conditions of a large part of the body politic, they are a necessary part of the social structure. See American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 209. It is to be remembered, however, in connection with this subject, that equality of condition is impossible, but equality of opportunity for each workman is possible, and any abridgment or curtailment of this right is against the fundamental law.

The proviso to the Act of 1872, that exempted persons engaged in such combinations from being classed as criminals, prohibits the organization or individuals from hindering "in any way" any person or persons desiring to labor. This was defined by the Act of 1876, P. L. 45, to mean that hindering, by the use "of lawful or peaceful means," having "a lawful purpose" in view, shall not be regarded as a violation of the act. But "the use of force, threat or menace of harm to persons or property," should be regarded as being not only unlawful but punishable by indictment. These, however, are not the only acts which may be committed which contravene the peace, good order and safety of the public, or the rights of workingmen.

Such acts as hostile assemblages, marches, parades or acts of individuals, separately, collectively in combinations, or under a system, which annoy or embarrass, intimidate or terrify those who desire to work, have more potency over men of ordinary nerve than actual violence, and are unlawful: O'Neil v. Behanna, 182 Pa. 236. A court of equity will intervene to protect persons and property by restraining such acts, threatened, done or likely to be done.

Appellants claim that primarily their aim and purpose was to maintain a proper standard of wages by persuading men to stop working for less wages, though the indirect result of this effort was to shut down the Adrian

mine, while appellee claims the indirect purpose was the primary one.

A peaceful effort, individually, collectively or concertedly, to bring about a cessation of labor in order to enforce a demand for betterment of wage or living conditions, even though the indirect purpose is accomplished, is not unlawful.

While the right to form combinations, and through a strike to exert means to prevent men from working, may be lawful, it remains so *only as long as the means employed are lawful.* Undoubtedly workingmen have the right to better their own condition, to abstain and have others abstain from working until they get the wages to which they feel they are entitled, but there is another right which must be recognized, with which no association of men can lawfully interfere, and that is the right of any person to work for whom he pleases, at the particular wage he pleases. A government which admits its inability to protect an honest workman in the pursuit of useful employment, simply admits its inability to function properly. This right has its corresponding right in the employer, to engage and have him work.

The Adrian plant was located in what is commonly known as a coal mining town. A company purchased a tract of land on which they made an opening. Lots were laid out, houses built by the company for its employees, churches and schools erected. We have held in a number of cases that a qualified use of these streets may be made by persons who desire to visit or have business relations with the miners who live in these houses. But the highways still remain the property of the company and continue so unless it appears that by some act they have dedicated the ways for public use. Appellants and their associates were on one of these highways, and if it was not dedicated they were trespassers, as they were not on the way to visit any of the miners at their homes, nor had any business relation with them, in the sense that term has been used. We need not decide

the question of dedication, but we will treat it, as the court below did, as being immaterial; and for the purpose of this case the highway may be considered as a public road, and the defendants not trespassers.

Appellants complain that the numerous findings of fact and inferences were not sustained by evidence, and the rule that the findings of fact of a chancellor are conclusive will not prevail where the finding is based on inference or deduction, the result of reasoning: Hamilton v. Fay, 283 Pa. 175; Miller's Est., 279 Pa. 30, 38. We shall narrate the leading facts; they may speak for themselves.

On March 27, 1925, and continuously thereafter until the filing of this bill, a large number of persons numbering from 75 to 450, appeared in parades on the road in the early morning when appellee's men were about to go to work. Their first march was without previous warning. Preceded by a brass band, they came into the mining town, marching up and down the road as the workmen filed past them to the mines. This was repeated every day (Sunday excepted), and sometimes in the middle of the day when the men quit work. The appellants claim the marching and parading were peaceful, and in no sense could be considered unlawful assemblies. Undoubtedly, unless restricted by the police powers exerted through cities, boroughs and townships, people have an unrestricted right to assemble on the highways or parade through the streets, unless their acts are inimical to public good or the safety and peace of the community would be disturbed thereby (Duquesne City v. Fincke, 269 Pa. 112), or unless they are intended to interfere with, annoy, embarrass or intimidate men at work.

Without considering the direct conduct of the strikers toward the workmen, as they passed along the highway, did such marching, under all the circumstances, have an aspect of hostility and intimidation, or did it, through fear, exert a moral coercion on those on whom it was

intended to operate? To accomplish this result it is not necessary that there should be force of arms or a threatening manner or attitude. Coercion may be accomplished without threats or violence. As stated by Mr. Justice MITCHELL in O'Neil v. Behanna, supra, 243, 244, such conduct of a "hostile......[assemblage] has a potency over men of ordinary nerve which far exceeds the limits of lawfulness. The display of force, though none is actually used, is intimidation, and as much unlawful as violence itself." The parade was not a community affair; it was intended to have effect upon those engaged in mining. This was its motive and purpose. It was a demonstration aimed at the fears rather than the judgment of those who desired to work. An angry, hostile assemblage is one thing; a friendly crowd quite a different thing. Nothing can be more terrifying than a large body of men manifesting their hostility or anger toward another body.

The spirit of these demonstrations is the thing that we look to, not the mere marching on the road, nor yet the friendly calls on the highway, later discussed. The parades were not solely for the purpose of showing the strength of the strike or asserting its importance, though undoubtedly they had that effect. Its personnel and manner engendered in the minds of the persons against whom it was intended to operate, fear for their personal safety if they continued to resist the demands made.

Though the organization may use every fair means of persuasion to accomplish their purpose, when they undertake, day after day, or less frequently, to parade on the public highway, at the time and place where the men employed pass to and from their work, this is not peaceful persuasion, but an annoyance, an intimidation, and, through fear, a moral coercion which the law will not tolerate. The highways may be used by a large body of men for parades within reasonable limits, but a parade which has lurking within it a spirit of terror, a commandment of fear, assumes an aspect and coloring far

different from a peaceful assemblage of men on the public highways. The purpose might have been perfectly legitimate, but the means employed was illegitimate.

Our conclusion is that the very fact of parading at the time and place constituted intimidation and was properly enjoined. The court below found: "The defendants can attach no blame, if those against whom their demonstrations were directed accepted them as they appeared, even though their intention may have been milder, and less purposeful, than it seemed......The plaintiff has a right to its business and to conduct it in its own way, employing whom it pleases and paying them such wage as may be mutually agreed upon. It has a right to carry on its business without molestation, and to have its employees, and those invited to or seeking employment by it, freely come and go, also without molestation, just as they may incline and be actuated by their own independent judgments. They have a right to thus come and go. These rights, when invaded or threatened, or their exercise in jeopardy, it is the duty of the court to protect and have respected by others when it is appealed to for that purpose." To this we agree.

Having made the above finding, the court below enjoined against "peaceable" acts in the eighth and tenth assignments of error. It was error to use this word; we shall discuss it later. The decree should be modified so as to restrain marching and parading at or near the premises of the complainant, or on the highways leading thereto.

Appellants object to the finding as to peaceful picketing, and the decree entered thereon. When the appellee filed its bill during the course of the marching and parading, the court below granted a preliminary injunction. Appellants, believing that it was not broad enough to reach this method, started immediately to picket. A line of twenty-five strikers was formed on April 25th, near the premises of the appellee, stationed in units of two, about 75 feet apart, extending over

1,000 feet, at places where the employees of appellee
would have to pass in going to work. Through these
lines they passed. The pickets moved backward and for-
ward as sentries, accosting the workingmen. It was con-
tinued, with varying forces of men from twelve to twenty-
six, until the attention of the court below was called to
it. None of the defendants were at any time employees
of the company, nor had they any interest in whom it
employed or the wage that was to be paid, save the gen-
eral interest which came to them as united mine workers
to preserve the established grade of wages adopted at
Jacksonville. The aim of the pickets was to prevent the
miners from going to work and inferentially to close
down plaintiff's mine. What we have said relative to
parading applies here with equal force. The very place-
ment of these men, their conduct or method of approach,
indicated anything but peaceful persuasion. "It is idle
to talk of peaceful communication at such time and
place. The number of men [even the smallest] consti-
tuted intimidation." The employees ran the gauntlet on
their way to work. The persuasion was persisted in day
after day, either by the same or other persons having the
same object in view. Under such circumstances, or even
for less, it loses its peaceful character and has a tend-
ency to create a breach of the peace. Persuasion, too
long and persistently continued, becomes a nuisance and
an unlawful form of coercion: 32 C. J. 165, paragraph
227.

In O'Neil v. Behanna, supra, Mr. Justice MITCHELL
states, "It is further urged that the strikers through
their committees only exercised ('insisted on' is the
phrase their counsel used in this court) their right to
talk to the new men, to persuade them not to go to work.
There was no such right. These men were there pre-
sumably under contract with the plaintiff, and certainly
in search of work, if not yet actually under pay. They
were not at leisure, and their time, whether their own
or their employer's, could not lawfully be taken up and

their progress interfered with by these or any other out-siders on any pretense or under any claim of right, to argue or persuade them to break their contracts. Even therefore if the arguments and persuasion had been con-fined to lawful means, they were exerted at an improper time, and were an interference with the plaintiff's rights which made the perpetrators liable for any damages the plaintiff suffered in consequence."

As stated by the Supreme Court of the United States, speaking through Chief Justice TAFT, "How far may men go in persuasion and communication and still not vio-late the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, con-sistent with the right of others to enjoy the same privi-lege. We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to in-fluencing the other's action are not regarded as aggres-sion or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persist-ence, importunity, following and dogging become un-justifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the per-son sought to be influenced has a right to be free and his employer has a right to have him free.

"The nearer this importunate intercepting of employ-ees or would-be employees is to the place of business, the greater the obstruction and interference with the business and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract atten-tion and congregation of the curious, or, it may be in-terested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes......

"We think that the strikers and their sympathizers engaged in the economic struggle should be limited to

one representative for each point of ingress and egress in the plant or place of business and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant, that such representatives should have the right of observation, communication and persuasion, but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion obstruct an unwilling listener by importunate following or dogging his steps. This is not laid down as a rigid rule, but only as one which should apply to this case under the circumstances disclosed by the evidence and which may be varied in other cases. It becomes a question for the judgment of the chancellor who has heard the witnesses, familiarized himself with the locus in quo and observed the tendencies to disturbance and conflict. The purpose should be to prevent the inevitable intimidation by the presence of groups of pickets, but to allow missionaries......

"A restraining order against picketing will advise earnest advocates of labor's cause that the law does not look with favor on an enforced discussion of the merits of the issue between individuals who wish to work, and groups of those who do not, under conditions which subject the individuals who wish to work to a severe test of their nerve and physical strength and courage": American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, on pages 204, 206, 207. It will be observed the court treats strikers as a collective term and what is done by one is done by all.

The Supreme Court left the decision of these questions largely to the trial judge. He is on the ground and better able to determine these matters. Working conditions in the American Steel Case are not like those in the present case; the means of ingress and egress there were at fixed points; here ingress and egress may

be at any point on the company line. It may easily be seen how missionaries, if permitted at all, must be regulated by the trial court so as to bring them within the spirit of the decision of the Supreme Court of the United States.

We therefore conclude that the picketing here carried on was unlawful and the placing of pickets in and upon the highways leading to these works may be enjoined. The qualifications to the decree should be omitted. The word "peaceful" should be eliminated. As modified, the decree should read to restrain picketing on or near the premises of the complainant, or on the highways leading thereto, that is, in any manner with the purpose and for the effect of intimidating, annoying, embarrassing, or, through fear, exercising moral coercion over those lawfully employed by the appellee, whether actual force or violence be used or not.

Appellants complain that they were not permitted to introduce in evidence books and records. This evidence would be perfectly proper if this was an action on the Jacksonville agreement against the Rochester & Pittsburgh Coal & Iron Company, if such action were sustainable. But the evidence would not aid in the determination of the questions that were here before the court.

After a careful consideration of all the evidence, with the modification of the paragraphs of the decree as herein indicated, following our usual practice, the decree of the court below is affirmed at the cost of appellants.