By this bill the complainant seeks to enjoin several trade union organizations and certain individuals acting in concert with them from what is alleged to be an unlawful interference with complainant's business and property rights.
The complainant is engaged in the retail furniture business at 113 Springfield avenue, Newark, New Jersey, and has been so engaged for the past four years. It and its predecessors have been engaged in this business for approximately twenty-one years. The defendants are Retail Furniture Employes Local No. 109, United Retail Employes of America, The Committee for Industrial Organization, Edward Quinn, Morris Green, Jack Kaufman and Sam Rous. The defendant Quinn is president of the defendant local, which is affiliated with the parent union and the C.I.O. The defendant Green is the secretary of the defendant local. The defendants Kaufman and Rous are members of the defendant local and former employes of the complainant. The defendant Rous is also a member of the bar of this state. Prior to the events which resulted in this controversy, the complainant had eight persons in its employ other than Mr. Canter, the president, and his son-in-law, Mr. Hollander. The bill alleges that immediately prior to August 26th, 1937, the defendants began a campaign to unionize complainant's business and succeeded in inducing seven of complainant's employes to join the defendant local. On August 26th, the defendant Quinn presented to the complainant a form of contract with the union and demanded its execution forthwith on pain of a strike of complainant's employes. Complainant was given thirty-six hours within which to sign the contract and upon its refusal seven of complainant's employes went out on strike and since that time the striking employes, *Page 577 
together with other members of the defendant unions, sympathizers and persons employed by the defendants for that particular purpose, have been engaged in the usual picketing and other activities attending controversies of this kind. Apparently, little actual violence in connection with this strike has occurred, although it is in evidence that a large rock or cobblestone was thrown through one of the show windows of complainant's store and there was a sidewalk brawl in front of it engaged in by the pickets and others, and resulting in injury to some of the pickets. The complainant charges the defendants with having staged this brawl and the defendants charge the complainant with having hired strike breakers to assault and beat the pickets. Which of these charges is true it is impossible to determine on the present proofs; nor is it necessary to do so at this time. The net result of the picketing, however, seems to have been interference with the free ingress and egress to complainant's store, the intimidation of customers and would-be customers and the general disorder usually incident to the massing of excessive numbers of pickets in front of or near an employer's place of business.
Upon the filing of the bill of complaint an order to show cause with limited restraint was entered. No restraint against picketing was imposed by that order, nor was such restraint sought by the complainant. A copy of the proposed contract submitted to the complainant by the defendants and which complainant refused to sign, is attached to the bill of complaint. It provides for the closed shop, recognition of the union as sole bargaining agency, increases in wages of all employes and decreases in working hours, together with stated vacations with pay. The increases in pay demanded were from twenty to twenty-five per cent. of the scale of wages then in force and the reduction in hours demanded ranged from three to twenty hours a week. The first provision in the proposed contract reads as follows:
"First, that the employers will employ solely and exclusively members of said union and no others, and that only members of said union in good standing will be recognized by the said employer as members of said union." *Page 578 
The contract and its schedules comprise seven pages of closely typewritten matter. There are twenty-three numbered paragraphs of the contract specifying what the employer shall do for or pay to the employe. I find not a single provision in the contract saying what the employe shall do for the employer. It provides for the complete and abject surrender of complainant's business to the control of the defendant union and upon its execution the complainant, whose capital is invested in the business, and whose capital and enterprise have made possible the striker's employment, would be reduced to a mere figurehead with practically no control of its own property and business. On behalf of the defendant it is claimed that this form of contract was submitted as a basis only for negotiation; but it is significant that the complainant was told to sign within thirty-six hours or a strike would be called; modification of the form of contract submitted was refused by the defendant union, and immediately upon the expiration of the time limited, and the complainant's refusal to sign, the strike activities were begun, and picketing commenced with signs and placards, prepared in advance and apparently awaiting only the arrival of the zero hour to be put into use. These facts are admitted by the defendants. On the return of the order to show cause the defendants filed two hundred and fifteen pages of answering affidavits. These affidavits are fourteen in number, thirteen of the affiants being members of the defendant local and seven of them being former employes of the complainant. But they cannot be accepted at their face value because it is perfectly obvious that the affiants did not and could not have had personal knowledge of the alleged facts to which they make oath. Cf. Mullins v. MerchandiseDrivers Local Union No. 641, 120 N.J. Eq. 376. Quinn's affidavit contains categorical denials of each charge of picketing of a threatening or intimidating character and of interference with complainant's business and free ingress and egress of customers. He denies that the strike is to enforce the closed shop (only) but charges that it is for better working conditions, shorter hours and higher pay. It also appears from this affidavit that Quinn *Page 579 
is employed as a salesman by the Christian Schmidt Furniture Company. If he has been in a position to obtain at first hand the information or the facts alleged in his affidavit, and it does not so appear, he has had little time within those three weeks to attend to his employment. The affidavits of Green, Oppenheim, Kaufman, Rous, Vogel and Bagley are of no greater weight. It also appears from the defendant Quinn's affidavit that the same form of contract had been presented to the Retail Furniture Dealers' Association prior to its submission to the complainant, and that that association had been requested to advise its members to adopt it. The Retail Furniture Dealers' Association, as its name implies, is an association of employers engaged in the retail furniture business in Newark and vicinity, and of this association the complainant is a member. It is also in evidence that two retail furniture houses in Newark or vicinity, one of which employs the defendant Quinn, and the other of which employs the defendants' affiant Oppenheim, who is treasurer of the defendant local, have already signed a similar contract with the defendant union. There are many other facts and circumstances connected with this controversy which indicate that this strike is but part and parcel of an attempt to unionize the entire retail furniture industry in Newark and vicinity and of the widespread campaign on behalf of "labor" to unionize all industry in this country. There is now pending in this court another bill of complaint filed by a retail furniture dealer in Newark against the defendant local, the defendant parent union and others, seeking restraint of picketing and other strike activities resulting from complainant's refusal to sign a similar contract.A. Finkenberg's Sons, Inc., v. Retail Furniture, c., Union
(Docket 120, page 165). In that case no strike exists, the sole purpose of defendants' activities being to compel unionization of the complainant's business, not only against its will, but also against the will of the employes. Cf. Feller v. Local 144,International Ladies Garment Workers Union, 121 N.J. Eq. 452.
At the oral argument on the order to show cause the complainant *Page 580 
expressed itself as willing to negotiate with the defendant union with respect to wages, hours of work and other provisions concerning working conditions of its employes, but refused to agree to the closed shop. I asked defendants' counsel if his clients would waive the provision in the contract providing for the closed shop. He replied in the negative, at the same time insisting that the closed shop provision was not of primary importance. From this attitude and his refusal to negotiate, except upon the basis stated, coupled with the other circumstances above mentioned, I think the conclusion is inescapable that the primary purpose of the proposed contract and of the instant strike is the closed shop; or, what is even worse, a shop closed to all except members of a particular union. But the language of the proposed contract speaks louder than any charge by complainant or denial by defendants.
There are certain principles which have their genesis in the natural laws and in express provisions and interdictions of our constitutions, and in the public policy of the federal and state governments, the truth of which cannot be denied:
1. Every citizen has certain rights which are absolute, i.e., inalienable.
2. The right to acquire and own property is an inalienable right.
3. The right of the citizen to work at his chosen lawful occupation is a property right.
By his work he earns subsistence for himself and his dependents and out of his earnings he may acquire property. This is an inherent indefeasible right, which includes the unrestricted privilege of bargaining for such employment as he chooses, at such wages as may be agreed upon by him and his employer. Of this right the legislature cannot deprive him; the laws of no trade union can take it from him, and it is the bounden duty of the courts to protect him in its possession and use.
4. The right to conduct a lawful business is a property right, no less than that of the workman to work at his chosen lawful occupation. *Page 581 
5. The employer has the right to be free from unreasonable interference in the management of his business. In the absence of contract, he has the absolute right to employ whom he will, and to cease to employ whom he will, when he will.
6. Under our form of government, the use of property and the making of contracts are normally matters of private concern. The general rule is that both shall be free from governmental interference. But neither property rights nor contract rights are absolute, for government cannot exist if the citizen may, at his will, use his property or rights to the detriment of his fellows, or exercise his freedom of contract to do them harm. Equally fundamental with the private right is the right of the public to regulate it for the public good.
7. Employes who are satisfied with their employment have a right to continue that employment unmolested by other employes who are dissatisfied and by others acting in concert with them.
8. All men have the absolute right to contract or refrain from contracting. The motives which actuate a man in refraining from making a contract in relation to labor or merchandise, or anything else, are beyond all challenge or inquiry, and he has the absolute right to act in a voluntary combination with others with respect to contracting or refraining from contracting.
9. All men, either singly or in voluntary combination, have the absolute right to refrain from being privately employed; but this right does not extend to preventing the employment of other men who are willing to work.
10. Employes have as clear a right to organize and select their representatives for lawful purposes as the employer has to organize his or its business and select his or its officers and agents.
11. The individual liberty secured by the federal constitution does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed of restraint. There are manifold restraints to which every person is necessarily *Page 582 
subject for the common good, because all rights are relative and must be exercised by one with due regard to the rights of others. On any other basis organized society could not exist with safety to its members. It is often overlooked, but it cannot be forgotten that for every right there is a correlative duty.
The foregoing recital is not, of course, inclusive. Cf.International Ticket Co. v. Wendrich, 122 N.J. Eq. 222.
The provision of the proposed contract which provides for the employment of members of the defendant local exclusively is violative of the fundamental right of non-member individuals to work and brings the contract directly within the rule of LehighStructural Steel Co. v. Atlantic Smelting and Refining Works,92 N.J. Eq. 131, in which Vice-Chancellor Backes said:
"Public policy favors free competition, and the courts have been keen to recognize the right of organized labor to compete for work and wage and economic and social betterment, and to use its weapon — the strike — to realize its lawful aspirations, but none has gone to the length of sanctioning a strike for a closed shop which has for its object the exclusion from work of workmenwho are not members of the organization." (Italics mine.)
The object of this proposed contract and of the strike here involved, is exactly what was there condemned.
This court has expressly held that closed shop contracts and a strike to obtain or enforce them are usually declared illegal because they create or tend to create a monopoly in the labor market and are thus opposed to public policy. Baldwin LumberCo. v. Local No. 560, c., 91 N.J. Eq. 240, 248; LehighStructural Steel Co. v. Atlantic Smelting and Refining Works,supra; Loiseaux Lumber Co. v. Carpenters and Joiners Local
(unreported, Docket 53, page 606); Aimco Co. v. Panaswitz
(unreported, Docket 99, page 172); Blakely Laundry Co. v.Cleaners and Dyers Union, Local No. 18422, 11 N.J. Mis. R. 915;Upholsterers, Carpet and Linoleum, c., Union v. Essex Reed andFibre Co., Inc., 12 N.J. Mis. R. 637; Wasilewski v. BakersUnion, Local No. 64, 118 *Page 583 N.J. Eq. 349; International Ticket Co. v. Wendrich, supra.
And this jurisdiction is not alone in so holding. Keith Theatre,Inc., v. Vachon, 134 Maine 392; 187 Atl. Rep. 692; Jeffersonand Indiana Coal Co. v. Marks, 287 Pa. 171; 134 Atl. Rep. 430.
And see C.B. Smith Metropolitan Market Co., Ltd., v. Lyon
(Opinion 417270, California superior court, Los Angeles county, decided July 26th, 1937); Pickett v. Walsh, 192 Mass. 572;78 N.E. Rep. 753; L.D. Willcutt Sons Co. v. Bricklayers'Benevolent Protective Union No. 3, 200 Mass. 110-17;85 N.E. Rep. 897; O'Brien v. People, 216 Ill. 354; 75 N.E. Rep. 108, 115;A.R. Barnes Co. v. Chicago Typographical Union No. 16,232 Ill. 424; 83 N.E. Rep. 940; Huntworth v. Tanner, 87 Wn. 670;152 Pac. Rep. 523; St. Germain v. Bakery and ConfectioneryWorkers' Union No. 9, of Seattle, 97 Wn. 282;166 Pac. Rep. 665.
These cases are grounded in that principle of public policy which prohibits exclusive privileges and monopolies. The history and development of this principle, both at the common law and in this country, are explained and discussed in Standard OilCompany of New Jersey v. United States, 221 U.S. 1, 51;55 L.Ed. 619; 31 Sup. Ct. Rep. 502. In enforcing this principle the law does not look to the results, which may be attributable to the actual operation of the contract or the combination, to discover whether or not the contract or combination is contrary to public policy. It examines the contract or combination itself to learn what it threatens, what its evil tendencies are, and what possibilities of harm to the general welfare are within it.Connors v. Connolly, 86 Conn. 641; 86 Atl. Rep. 600, 605.
It has been suggested that the public policy of this state has changed and that the principle of monopoly is not applicable to the situation here presented. This is not so. The reasons underlying the application of this principle to a labor contract or union have just been reiterated by the court of last resort in this state. Our court of errors and appeals, in Cameron v.International, c., Local Union No. 384, 118 N.J. Eq. 11 (atp. 26), speaking through Mr. Justice Heher, said: *Page 584 
"It is patent that the senior members are striving to obtain amonopoly of the labor market in this particular trade, and todeprive the junior member of an equal opportunity to obtainemployment and earn a livelihood for himself and his family. Infact, monopoly has been practically accomplished; absolute andcomplete dominion of the labor market is within reach. The publicevils flowing from this policy are apparent. It tends to economicservitude — the impoverishment of the one class, the `juniors'for the enrichment of the other — and is manifestly opposed tothe public interest. The inevitable results are the loss of theservices of useful members of society, and unrest, discontent anddisaffection among the workers so restrained — a condition thatis unquestionably inimical to the public welfare. This is anunfair exercise of the power springing from the combination. Itis an arbitrary and unreasonable restraint of trade, andtherefore obnoxious to the law. * * *
"The constitutional rights of liberty and property may be limited only to the extent necessary to subserve the public interest. The union cannot, in the service of its interest, deprive a non-member of his constitutional right of liberty and property. The statutes giving sanction to such unions weredesigned `to secure most favorable conditions for labor of theirmembers' and are `not a warrant for making war upon the non-unionman, or for illegal interference with his rights and privileges.
* * * There are in such a combination against an employe the suggestions of coercion, attempted monopoly, deprivation of livelihood, and remoteness of the legal purpose of the union to better its members' condition.' American Steel Foundry v.Tri-City C.T. Council, 257 U.S. 184; 42 Sup. Ct. Rep. 72;66 L.Ed. 189. And this limitation is likewise imposed upon the combination in dealing with its members. It is restricted to the advancement of the common interest through peaceable and lawful means, provided the public interest is not thereby injuriously affected. The function of a trade union is to increase the individual bargaining power by collective action, and thus to promote the common interest of its members. If, in the *Page 585 
pursuit of this objective, through peaceable means and methods that are otherwise deemed to be lawful, injury incidentally results to another, it is damnum absque injuria. But the power conferred upon such an organization must be directed to the advancement of the common interest and general welfare of its members. Such is its extent and limit." (Italics mine.)
In that case the complainants had voluntarily entered into the contract which the court had declared to be obnoxious as an arbitrary and unreasonable restraint of trade as the result of which restraint the complainants had voluntarily bargained away an inalienable right to the prejudice of the public interest. If such an agreement in restraint of trade is obnoxious to the public welfare, even though voluntarily entered into, what lawfulness can be imported to the purpose of the defendants here, when they attempt by the coercive methods of a strike to achieve a monopoly of the employment in the furniture trade in the city of Newark which must necessarily result in an arbitrary and unreasonable restraint of trade? Obviously such a purpose is unlawful. While the employes may lawfully strike for increased wages and shorter hours, or to better their working conditions, when such a purpose is combined with an unlawful purpose clearly contrary to the public interest that interest is paramount, and the combination of the lawful and the unlawful purpose renders the strike itself and all activities in connection therewith illegal.
This is no one-sided doctrine, as Vice-Chancellor Buchanan pointed out in Aimco v. Panawitz, supra, wherein he said:
"Trade unions are lawful and laudable in themselves. They have accomplished much — very much — for the betterment of their members, and, indeed, for the advantage of the public generally. But any endeavor on their part to establish a monopoly of employment, utterly to deprive other men of an equal right of the opportunity for similar employment in the locality, is as reprehensible, as indefensible, as unlawful, as would be a combination of employers in an agreement that no member of a union should be employed by them. *Page 586 
It is absolutely contrary to the principles of liberty and freedom of opportunity — to the preservation of which this country is dedicated."
Also Cf. Walsche v. Sherlock, 110 N.J. Eq. 223; Cameron v.International, c., Local Union No. 384, supra; Collins v.International, c., of the United States and Canada, 119 N.J. Eq. 230.
The object of a strike being unlawful all acts in support thereof, including picketing, are also unlawful. Elkind Sons,Inc., v. Retail Clerks,' c., Association, 114 N.J. Eq. 586,591; Bayonne Textile Corp. v. American Federation of SilkWorkers, 116 N.J. Eq. 146, 161; International Ticket Co. v.Wendrich, supra; Upholsterers' Carpet and Linoleum MechanicsInternational Union, c., v. Essex Reed and Fibre Co., supra, and authorities cited at page 639; and P.L. 1926 ch. 207 p.348, is not applicable.
It is often asserted that there is a distinction between a closed shop in a whole locality, sought by the union as a protective measure, and one sought in order to create a monopoly. As to the question of a closed shop in substantially an entire industry, based on motives intrinsically self-protective, the authorities are conflicting. The Four Plating Co., Inc., v.Mako, 122 N.J. Eq. 298. But such is not the situation in this case.
The point of cleavage is that, prima facie, a strike for a closed shop is unlawful, but some cases hold it may be justified by showing it was inaugurated to advance the material interests of the union. Assuming, but only for the purpose of argument, that such might be the law of this state, the defendants would be called upon to justify their actions. As pointed out, the complainant here expressed itself as willing to negotiate with the defendant union with respect to wages, hours of work, and other provisions concerning working conditions of its employes, but refused to agree to a closed shop. Defendants' counsel was asked if he would waive the provision in the contract providing for a closed shop. He replied in the negative, and, at the same time, insisted that the closed shop provision was not of primary importance. *Page 587 
Evidence of the objects of this strike lies in the minds of the leaders of the defendants. When they refuse to disclose they must submit to the adverse inference necessarily drawn from their silence. White Mountain Freezer Co. v. Murphy, 78 N.H. 398;101 Atl. Rep. 357.
There is no evidence of competition. There is no discrimination against union members, as there was in Four Plating Co. v.Mako, supra. The only proofs which might be suggested to be proofs of justification of their actions are the demands concerning wages, hours, and some conditions of employment. These could be negotiated with the complainant. But the effect of the effort to obtain the sought-for monopoly would crush the non-union man or woman, for no apparent reason connected with the betterment of working conditions. Cf. Curran v. Galen,152 N.Y. 33; 46 N.E. Rep. 297. The burden of showing justification, if material, would be on the leaders of this strike, not the working man or woman, and these leaders not only did not sustain this burden of proof, but they refused to assume it.
Also, it is often asserted that the National Labor Relations act, act of July 5th, 1935 (49 Stat. at L. 449 ch. 372; 29U.S.C.A. § 151), has changed the public policy of the federal government with respect to monopolies by labor in industries engaged in interstate commerce. It is true that article 8, section 3 of that act provides:
"That nothing in this chapter or in sections 701 to 712 of Title 15, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this chapter as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employes as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."
But this section has reference only to a voluntary agreement between the employer and such labor organization as the representatives of the employes as determined under article 9 (a) of the act. This effects no change in the principle of public policy relating to monopolies. *Page 588 
But the supreme court in construing article 9 (a) of the act, in National Labor Relations Board v. Jones Laughlin SteelCorp., 301 U.S. 1; 57 Sup. Ct. 615; 81 L.Ed. 893, held that under article 9 (a) the obligation to treat with the true representative was exclusive and hence imposed the negative duty to treat with no other; that the section was designed to enjoin the company against entering into any contract concerning rules, rates of pay and working conditions, except with a chosen representative, and to prevent collective bargaining with anyone purporting to represent the employes, other than the representative they had selected; but that the section does notpreclude such individual contracts as the employer might elect tomake with individual employes.
It is clear from this that the compulsion in the act is limited to the designation of the parties who can act on collective bargaining agreements.
The chief justice in that case said:
"The act does not compel agreements between employers andemployes. It does not compel any agreement whatever. It does notprevent the employer `from refusing to make a collective contractand hiring individuals on whatever terms' the employer `may byunilateral action determine.' The act expressly provides in section 9 (a) that any individual employe or a group of employes shall have the right at any time to present grievances to their employer. The theory of the act is that free opportunity for negotiation with accredited representatives of employes is likely to promote industrial peace and may bring about the adjustments and agreements which the act in itself does not attempt to compel. As we said in Texas and N.O.R. Co. v. Brotherhood ofR. and S.S. Clerks, 281 U.S. 548; 74 L.Ed. 1034; 50 S.Ct. 427,supra, and repeated in Virginian Railroad Co. v. SystemFederation, R.E.D., 300 U.S. 515, ante, 789; 57 S.Ct. 592; the cases of Adair v. United States, 208 U.S. 161; 52 L.Ed. 436;28 S.Ct. 277; 13 Ann. Cas. 764, and Coppage v. Kansas,236 U.S. 1; 59 L.Ed. 441; 35 S.Ct. 240; L.R.A. 1915C 960, are inapplicable to legislation of this character. The act does notinterfere with the normal exercise *Page 589 of the right of the employer to select its employes or todischarge them. The employer may not, under cover of that right, intimidate or coerce its employes with respect to their self-organization and representation, and, on the other hand, the board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investigation with full opportunity to show the facts." (Italics mine.)
The act indubitably requires that a bona fide attempt be made by the designated parties to reach an agreement by collective bargaining. It goes no further. The right to strike is not interfered with, impeded or diminished. (Section 13.) Nor is the right of the employer to select and discharge his employes at will limited.
As to the public policy of this state, it is the function of the legislature to declare it, the duty of the courts to define it within constitutional limitations and the duty of the executive to enforce it as so declared and defined. The principle applied in this case has recently been reiterated by our court of last resort and it is significant that our legislature has not seen fit to enact a statute, similar to the National Labor Relations act, applicable to intrastate commerce. The constitution does not forbid cautious advance in dealing with evils which are exhibited within the range of legislative power.National Labor Relations Board v. Jones Laughlin Steel Co.,supra.
The citizens of this state have the right to petition the legislature and ask that the public policy of the state be changed. When it is so changed by the legislature the courts must follow it within constitutional limits. But citizens or groups of citizens or their leaders, who do not avail themselves of this inalienable right of petition, or fail to convince the legislature that the relief sought by their petition is conducive to the general welfare, should not attempt to place the blame on the courts in the hope that courts will be intimidated into departing from the established principles of law, equity, order, and public policy by the clamor stirred up by these leaders among a part of the citizens whom these leaders *Page 590 
have deliberately deceived by misrepresentations circulated with the single design to obscure their own failure to follow the orderly procedure and processes of our form of government. A court which would yield under such circumstances should not attempt to justify its continued existence. Such actions are not consonant with principles of constructive citizenship, since the right of petition to the legislature is one of the foundation stones of orderly government. The duty to use it applies to employer and employe, union and non-union workers alike. But in this connection the statement of Kephart, J., in Jefferson andIndiana Coal Co. v. Marks, supra, that "A government which admits its inability to protect an honest workman in the pursuit of useful employment simply admits its inability to function properly," will bear repeating. The statement is equally applicable to the business man in the lawful conduct of his business.
Miss Geller's affidavit shows clearly that it was not a desire to join the union and have it bargain for her and other employes, collectively, that induced her to strike, but fear of the loss of her job through unionization of her employer's business — the avowed object of the union. But collective bargaining under the facts of the instant case would mean bargaining by a self-chosen, self-appointed representative who has forced himself upon the employes, and obtained their approval by the same sort of coercion and intimidation that he proposes to bring to bear against the employer, ostensibly to bring about better working conditions for the employes, but in reality to drive them into the union fold. Cameron v. International, c., supra; Collins
v. International, c., supra. If the employe wants to join the union, that is his privilege, but it is equally his privilege to stay without the fold. As was aptly said in Keith Theatre v.Vachon, supra, "unionization obtained, these employes would lose their jobs unless they joined the union. This court should neither deprive a laborer of his lawful employment nor force him to join a union * * *," and in C.B. Smith Metropolitan MarketCo., Ltd., v. Lyon, supra: *Page 591 
"Conditioning the right to labor in one's chosen trade upon membership in any organization would amount to an extraneous limitation upon the inalienable right to acquire property which necessarily includes the right to labor for the means by which to acquire it. Such a limitation upon one's free will, if imposed would amount to an alienation pro tanto of one of the inalienable rights. If the inalienable may be thus alienated in part it may be alienated as a whole in the same manner, and thereby the enshrined and cherished bill of rights becomes a vacuum."
The recent decision of this court in Four Plating Co. v.Mako, supra, was urged at the oral argument as authority for the activities of the defendant, particularly the picketing, and it is claimed that this decision modifies the previous decision of this court in International Ticket Co. v. Wendrich, supra, but it does not. Vice-Chancellor Bigelow, who decided the FourPlating Co. Case, distinguished it from the previous decision and it is apparent that no conflict was intended. In theInternational Ticket Co. Case, as Vice-Chancellor Bigelow correctly stated, there was an element of monopoly upon which, in part at least, the finding that the strike was unlawful and the consequent restraint were based. In the Four Plating Co. Case, it was expressly found as a fact that no monopoly was sought and that there were no other facts which spelled the illegality of the strike or its activities. As each case involving a labor dispute must be determined on its own facts and circumstances, no hard and fast rule of law uniformly applicable in determining the legality or illegality of a strike can be laid down and each individual judge must be responsible for his own findings of fact. While it is true that ordinarily, in the past, the closed shop in a single factory not controlling an entire industry has been held to be entirely consonant with public policy, that rule cannot be uniformly applied to-day unless the obvious is entirely ignored. Changed or changing conditions in the industrial world "may necessitate new applications of legal and equitable rules and concepts requiring the courts to render their judgments with more fidelity to economic facts, with more general utility and *Page 592 
in partial or complete disregard of rules `conceived in the past, upon the basis of totally different postulates and world conditions.'" Fifth Avenue Bank v. Compson, 113 N.J. Eq. 152,154. The individual strike or the attempt to unionize a single shop or place of business cannot to-day be considered in isolation from the wave of strikes and labor controversies sweeping the country from east to west and from north to south; but every strike or labor controversy must be considered with some relation to general industrial and economic conditions, of which the court will take judicial notice. Cf. Young v. Weber,117 N.J. Eq. 242; Bucsi v. Longworth Building and LoanAssociation, 119 N.J. Law 120. To appear blind to these conditions would be to confess an ignorance of everyday affairs which will not be attributed to, much less admitted by, the court. The court will view the whole field and consider all pertinent facts and circumstances bearing on the true character of the activities and the purpose of the actors. "Let the hardship be strong enough and equity will find a way, though many a formula of inaction may seem to bar the path." Per Judge (now Justice) Cardoza, in Graf v. Hope Building Corp., 254 N.Y. 1,8; 171 N.E. Rep. 884, 888.
In the Four Plating Co. Case it was intimated that the decision of the court of errors and appeals in Hudson BusTransportation Drivers' Association v. Hill Bus Co., 121 N.J. Eq. 582,
necessarily involved an implication that closed shop contracts in general were not contrary to public policy and were enforceable. That intimation was evidently based upon the assumption that the legality of a closed shop contract was there in issue, and it may have resulted from an incomplete recital of the facts in the appellate opinion. To avoid the possibility of any misunderstanding as to the effect of that decision, I have, since the filing of the opinion in the Four Plating Co. Case, examined the state of the case and briefs in the Hudson BusAssociation Case as filed in the appellate court. That examination reveals that the legality of the contract there involved was not in issue in either this court or the court of errors and appeals. In this court, the *Page 593 
preliminary restraining order, maintaining the status quopendente lite was, in effect, a consent decree and no appeal was taken from that portion of the decree relating to performance. A consent decree is not a precedent. Miller v. Bond and MortgageGuaranty Co., 121 N.J. Eq. 197. The controversy in the appellate court was between the original parties, both complainant and defendant, on the one hand, and the intervenors on the other. The appeal had to do only with the right to intervene.
The restraints already imposed, broadened to enjoin all picketing, will be continued until final hearing.