This memorandum is written for the purpose of an appeal from an order advised by me herein under date of January 3d 1939, and enjoining the defendants from certain strike activities, including picketing, distributing of handbills and obstructing ingress to complainant's place of business. The order appealed from continued restraints theretofore imposed upon application for preliminary restraint upon notice as required by the rules and was entered after cross-examination of complainant's affiants by counsel for the defendants, and after consideration of the proofs submitted on behalf of the parties. The facts out of which this controversy arose, as disclosed by the proofs, are as follows: *Page 376 
The complainant operates a shoe store at 159 Market street, in Newark, and has conducted its business at that address since 1934. The business is located near one of the busiest street corners in the world and in a building for which complainant pays a rental of $26,500 a year. Complainant has always operated its business on the open shop plan and until the events which gave rise to this controversy, had never experienced any labor troubles. None of its employes had expressed any dissatisfaction with their wages, hours or conditions of employment and no demands for any change in the terms or conditions of their employment had been made upon complainant by its employes or anyone representing them; in fact, up until the date of the entry of the order appealed from, no specific demands for any change touching the terms or conditions of employment had been made by anyone. Complainant's business reaches its highest peak in December and particularly during the period from December 15th to December 25th. Notwithstanding there had been no expression of dissatisfaction by complainant's employes with the terms and conditions of their employment, one Robert Brown, who styled himself general manager of the defendant union, in October, 1938, wrote to complainant's president stating that the union had been designated as the representative of complainant's employes "for collective bargaining with you in reference to hours, wages and other terms and conditions of employment." Other correspondence ensued, and on December 5th, 1938, Brown addressed a letter to complainant's president advising him that "unless you meet a representative committee of your employes and our union for collective bargaining within forty-eight (48) hours, we will becompelled to seek other remedies." (Italics mine.) No specific demands having been made and no dissatisfaction having been expressed by complainant's employes, the complainant refused to discuss the matter with the union representative, but later agreed to confer on the subject of collective bargaining with the Rev. L. Hamilton Garner, director of the Newark Labor Relations Board, and did so on December 13th, 1938. This conference was between the said director and Mr. Waterman, complainant's secretary. The complainant operates nineteen stores in various parts of *Page 377 
the United States and the secretary, at about the time of this conference, was obliged to go to Chicago on a business trip, but agreed with Mr. Garner to confer with General Manager Brown on December 19th, on his return from that trip. He also suggested that he was willing to meet Mr. Brown that afternoon (December 13th, 1938) at the Grand Central railroad station, where he was to take a train for Chicago. These facts being communicated to Mr. Brown, he refused to meet complainant's secretary as suggested or to await his return, and on December 14th, seven of complainant's employes left its employ and began picketing complainant's place of business, carrying signs reading as follows: "Kitty Kelly Shoes refuse to bargain collectively with our Union;" "Kitty Kelly employes on strike for better working conditions. Help us win;" "Kitty Kelly Shoes Employes are on strike for Union conditions;" "Please help us win. We deserve your co-operation. Employes of Kitty Kelly Shoes."
Photographs attached to the bill of complaint show the manner of the picketing and the crowded condition of the sidewalks while such picketing was going on. The conclusion that the rights of the public in the use of the sidewalk in front of complainant's store, as well as those of the complainant, were considerably abridged by the parading of the pickets, is inescapable. As a matter of fact, the complainant had not refused to "bargain collectively" with the defendant union and the placards and circulars publicizing the strike were false in this respect, at least. Complainant's secretary had already discussed the matter with the director of the Newark Labor Relations Board and had agreed to confer with Mr. Brown, notwithstanding the fact that up to that time none of the employes had expressed any dissatisfaction with their terms or conditions of employment and had made no demands upon their employer.
Let us assume, however, but only for the sake of argument, that complainant had refused to meet Mr. Brown "for the purpose of collective bargaining." Would that have afforded any excuse for the picket line? Is there anything unlawful, or even reprehensible, in an employer's refusing to bargain with a labor union? Has industry reached the point where *Page 378 
the owner of the business has no longer the right to select his employes and define his own business policy — to operate on the union or non-union plan, as he pleases? If I understand the law, the answer to each of these questions must be in the negative. To act freely in these matters, without molestation or compulsion, and indeed, without the unsolicited advice of the union, is the owner-employer's constitutional right. The authorities supporting this contention are legion. I cite only Hitchman Coal and CokeCo. v. Mitchell, 245 U.S. 229, 250, 251; Brennan v. UnitedHatters, c., 73 N.J. Law 729, and Currier Sons v.International Molders' Union, c., 93 N.J. Eq. 61. In theHitchman Case, Mr. Justice Pitney, speaking for the United States supreme court (at p. 250), said:
"Whatever may be the advantages of `collective bargaining,' it is not bargaining at all, in any just sense, unless it is voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union, and other employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make. This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment, as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power."
However that statement of the law may have been modified by the National Labor Relations act, it is still a correct statement of the law of New Jersey; and the National Labor Relations act has no application to this controversy.
There is considerable conflict between the affidavits filed on behalf of the complainant and those on behalf of the defendants, but I think a careful reading of them all will disclose that those of the complainant are the more reliable. *Page 379 
Defendants' affidavits bear the stamp of an effort to deceive the court as to the number of complainant's employes belonging to the union and those going on strike. Brown's affidavit states that "all of complainant's employes except" seven, whose names he mentions, are members of the union and have gone on strike. In another part of the affidavit he says that complainant's employes number twenty-two and that all but seven had gone on strike. As a matter of fact, the number of complainant's regular employes totals fourteen and but seven of those went on strike. Only six of them have filed affidavits in which they claim membership in the union. All of defendant's affiants other than Brown and Levine content themselves with stating that they have read Levine's affidavit and that the facts therein stated are true. They have no probative value. They affirm allegations of fact as to which even Levine had no knowledge.
The principal affidavits filed on behalf of the defendants are those of Brown and Levine. They contain many allegations obviously based upon hearsay and concerning facts of which they have no personal knowledge. Brown's affidavit in particular speaks of general conditions touching the retail trade in Newark and vicinity and has very little to say touching the complainant's business or conditions of employment in complainant's establishment. Both these affiants deny that the object of the strike and of other activities of the defendants is to control the complainant's business or to obtain a monopoly in the retail stores labor market in Newark, but the object and effect of defendants' activities is best judged by the circumstances and not by words. Actions always speak louder than words. The facts that Mr. Brown has been able, in less than two years, to corral over one thousand members in his organization and that he has obtained many contracts of employment in the retail trade, and is conducting his campaign for more of such contracts, are all evidential of a concerted effort by him and his associates to monopolize and control employment in the retail business of Newark and vicinity. The proffered contract referred to in the reply affidavit of Sidney J. Waterman, as involved inBlonder v. United Retail Employes of Newark, c., 126 *Page 380 N.J. Eq. 322, speaks eloquently as to the purposes of the defendant union's campaign for control of employment in the retail trade. We cannot be expected to close our eyes to the obvious. If Mr. Brown and his union do not want to control employment in the retail trade, what is the object of his organization and its campaign for union contracts? I submit there is no answer. Control is sought, and that means monopoly, time after time outlawed in this state. See the long line of cases cited in Canter Sample Furniture House, Inc., v. RetailFurniture Employes, Local 109, 122 N.J. Eq. 575 (at p. 582). The vital question is, when is a monopoly or an attempt to monopolize indicated? That is a question which must be answered by the facts and circumstances of each case as construed by the court. Different courts and judges may have varying views as to what constitutes a monopoly or an attempt to monopolize a business; but the decision of this vital question should not result from spinelessness or fear engendered by the mouthings of the mob. Nor is the employer obliged to wait until the monopoly is an established fact before seeking the injunctive aid of this court. Mr. Justice Pitney, in the Hitchman Case (at p. 248), said:
"Unionizing the miners is but a step in the process of unionizing the mines, followed by the latter almost as a matter of course. Plaintiff is as much entitled to prevent the first step as the second, so far as its own employes are concerned, and to be protected against irreparable injury resulting from either."
That language is peculiarly applicable here. Even if this were only the first step of this union to establish a monopoly in employment in the retail trade, which obviously it is not, the complainant has the right to halt the progress so far as its business is concerned.
There is no question in my mind as to what is the object of this strike and the union's activities. It is so apparent that it merits little discussion. A reference to Brown's affidavit concerning general labor conditions in retail stores in Newark and vicinity and objects of the union (pages 52 to 56 of the printed state of the case) is all that is necessary to show that the union activities complained of in this case are but a part *Page 381 
of a general campaign to unionize all retail stores. Strike activities of a union which is unable to formulate any specific statement of grievances, or any specific demand for betterment of working conditions, and striking employes who have no better idea of what they are striking for than is shown by the affidavits of the general manager of the union, must be considered as having but one object, and that the control of the employer's business through unionization. And that brings us squarely to the question whether an employer is to be permitted to formulate and pursuehis own business policy, or is to be compelled to submit to the demands and restrictions sought to be imposed upon him by a union labor leader. Unless the law of this state, as established by our constitution, has undergone a radical change of which I am ignorant, the employer still has some rights and one of them is to run his business on the open shop plan if he desires to do so. And there are many others, some of which were mentioned inInternational Ticket Co. v. Wendrich, 122 N.J. Eq. 222, 231,
and in Canter Sample Furniture House, Inc., v. RetailFurniture Employes, Local 109, 122 N.J. Eq. 575, 580, which are not to be subjected to union restriction or domination.
While in Chicago, complainant's secretary was advised of defendants' strike activities, and immediately returned to Newark where he found conditions as above recited. The Christmas trade being at full tide, he immediately discharged the striking employes and employed others in their places. This action was necessary because of the busy Christmas shopping period and in order to avoid serious losses. No difficulty was experienced in obtaining competent and satisfactory help to fill the places made vacant by the discharge of the striking employes, and complainant's business continued to function in an orderly and normal manner except for the picketing and other strike activities complained of.
There can be no doubt about the right of an employe not bound by contract to quit his employment when he pleases but "neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike." Dorchy v. Kansas, 272 U.S. 46; and there is a correlative right on the part of the employer to hire and fire his employes at will. And in *Page 382 
the absence of contract, this right of the employer to hire and fire is absolute. In a hiring at will an employe may be discharged at will for any reason or no reason at all. 39 C.J.71 tit. "Master and Servant" ¶ 60; Currier Sons v.International Molders' Union, c., supra; Southern CaliforniaIron and Coal Co. v. Amalgamated Association, 186 Cal. 604-7;200 Pac. Rep. 1; Adair v. United States, 208 U.S. 161; Coppage
v. Kansas, 236 U.S. 1; Truax v. Raich, 239 U.S. 33; HitchmanCoal and Coke Co. v. Mitchell, supra; Truax v. Corrigan,257 U.S. 312. A fortiori, does the right to discharge exist where the employe has been guilty of illegal acts, unfaithful to his employer or false to his trust. National Labor Relations Board
v. Jones Laughlin Steel Corp., 301 U.S. 1; National LaborRelations Board v. McKay Radio and Telegraph Co., 304 U.S. 333;National Labor Relations Board v. Fansteel Metallurgical Corp.
(not yet reported in U.S. Reports); 83 L.Ed. 469. This right was exercised in the present case and justifiably so. The striking employes had no vested right in their jobs, nor did they obtain any additional rights by the act of striking. A striking employe is certainly not entitled to any greater consideration and has no rights superior to his co-worker, who does not go on strike. I quote the following from respondent's brief, which I approve and adopt as my own:
"If what we have said thus far is true then the answer must be that he may rightfully discharge them and completely terminate the relationship. Any other view would mean that as soon as an employe goes on strike he secures some kind of vested interest in his job which he did not have before and the employer cannot discharge him. But this proposition is altogether at variance with the right which we have just observed the employer possesses. A clear distinction exists between a lock-out of employes whom the employer has not replaced and with whom he is still disputing, and a discharge of employes whose jobs the employer filled by permanent replacements. In the one case the relationship of employer and employe still exists. The employer has not exercised his right to terminate that relationship. In the other case the *Page 383 
employer has completely put an end to the relationship by permanently filling the jobs of the striking employes.
"Thereafter, the employe stands in no relationship whatever to the employer. He has no job that he can get back. The only excuse for picketing thereafter would be to bring damage upon the employer. Picketing would no longer serve to get back jobs or settle a dispute because there are no jobs to be gotten and no dispute to settle. The employer has taken the unequivocal stand that he will not employ the individuals who are picketing under any circumstances and on any terms. He has discharged them."
In Mode Novelty Co. v. Taylor, 122 N.J. Eq. 593, it was held that picketing is a concomitant of a strike and where no strike exists picketing is unlawful; that when a strike ends the controversy ends, and there is no longer any necessity or excuse for picketing; and that a strike is terminated when the striking employes' positions have been filled with competent men and the employer's business is operating in a normal manner and to a normal extent. That is the exact situation here. Mode NoveltyCo. v. Taylor, supra, announced no new doctrine. The authorities cited in the opinion in that case fully support the principle there laid down. That decision has been uniformly followed in this court. G. Loewus Co., Inc., v. Wine, Liquorand Distillery Workers Union (Stein, V.C., not reported, Docket 124, page 96); Blonder v. United Retail Employes (Bigelow, V.C., not reported, Docket 123, page 567); reversed (Court ofErrors and Appeals), 126 N.J. Eq. 322; Krich-Radisco, Inc., v.Martin Glass et al. (Bigelow, V.C., not reported, Docket 124, page 96). These citations are by no means inclusive.
The foregoing conclusions are written pursuant to constitutional mandate and under considerable pressure of current litigation. The "reasons" herein expressed might be multiplied almost indefinitely, but only by stretching this memorandum to inordinate length. Additional reasons, which might be expressed, would have no greater individual weight than those already advanced, which are deemed ample to support the decree of this court. *Page 384