## Spungin's Appeal

*McNees, Hollinger & Nurick* and *Caldwell, Fox & Stoner*, for appellant.

*Barry H. Hepburn* and *Charles J. Short*, for Pennsylvania Labor Relations Board.

Fox, J., February 28, 1938.—This is an appeal from the order of the Pennsylvania Labor Relations Board under the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, also raising questions as to the constitutionality of the act. The board after hearing made a

number of findings of fact, the first nine of which are not controverted. Number 10 and part of number 14, being the important ones in the case, are as follows:

"10. In view of respondent's attitude toward the organization of his plant and in view of the fact that organization activities ceased almost simultaneously with the discharge of Albert, Arthur, and Ernest Thieme, we find that respondent has interfered with and restrained his employes in the exercise of their right with and restrained his employes in the exercise of their right to self-organization and to form, join, or assist labor organizations. We also find that respondent has dominated and interfered with the formation of a labor organization in his plant."

"14. We find it equally difficult to reconcile respondent's own admission that the men were talking strike and that he wanted to prevent such action.

"Upon the whole record, and by a fair preponderance of the testimony, we find, therefore, that respondent discharged Albert Thieme, Arthur Thieme, and Ernest Thieme, because of their activities in joining and attempting to organize a union in respondent's plant, and that respondent discriminated in regard to the tenure of employment of these employes for the purpose of discouraging their membership in a labor organization. We find, further, that the necessary effect of the discharge of Ernest Thieme was the restraining and coercing of his father, Albert Thieme, in the exercise of his rights to form, join, or assist labor organizations."

The others are of less importance and relate to the time of employment of complainants, their experience, their duty at their work, conduct while at work, and their wages.

The charge in the complaint in substance is, that the said respondent discharged Arthur, Albert, and Ernest Thieme, because of their membership and activities in organizing a labor union in respondent's plant, and that

he has refused to reinstate them in violation of the said act which is more fully shown by the complaint filed.

To this complaint an answer was filed by respondent admitting the discharge of the said Thiemes, but denying that they were discharged for the reasons given in the complaint and averring that they were discharged for other reasons that were not violations of the said act.

A hearing was held on October 21, 1937, when L. G. Lichliter, chairman of the board, and John F. Breslin, a member, conducted the same, although John F. Breslin was absent during part of the hearing. The board was represented by its counsel.

The paramount question in the case is what was the reason for the said discharges.

In its order, the board has concluded as follows: 1, 2, and 3, that respondent cease and desist from in any manner interfering with, restraining, or coercing his employes in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection; from interfering with the formation of any labor organization of his employes; from in any manner discouraging membership in any labor organization of his employes, by discriminating in regard to hire and tenure of employment or any term or condition of employment, or by threats of such discrimination.

4. That respondent offer to the said discharged men and each of them immediate and full reinstatement without prejudice to the seniority or other rights and privileges and make whole to the said three discharged men and each of them any loss of pay they have suffered by reason of the discharge by payment to each of them of the sum of money equal to that which each of them would normally have earned as wages during the period from the date of discharge to the date of offer of reinstatement, computed at the average weekly wage earned by each

of them at the time of the discharge, less any amounts earned by each of them during such period; post notices in conspicuous places in respondent's plant stating that respondent will cease and desist as aforesaid; that such notices will remain posted for a period of 30 consecutive days from the date of posting and that satisfactory proof be furnished the board that the posting of such notices has been complied with.

The constitutional questions raised by the defendant in the appeal may be epitomized as follows:

1. Due process: (*a*) Deprivation of liberty and property without due process and without judgment of peers or law of the land; (*b*) unlawful interference with liberty of contract; (*c*) police power; (*d*) impairment of obligation of contract.

2. Special legislation: (*a*) Regulating practice and jurisdiction of tribunal; (*b*) changing rules of evidence in tribunals; (*c*) changing methods for collection of debts and enforcing of judgments; (*d*) regulating labor and trade; (*e*) classification.

3. Trial by jury: (*a*) Denial of right of trial by jury.

These questions we think have been determined by the appellate courts of Pennsylvania, as well to some extent by our Federal courts.

The instant act contains a most unusual provision, as follows:

"Section 2. Findings and Policy.—(*a*) Under prevailing economic conditions, individual employes do not possess full freedom of association or actual liberty of contract. Employers in many instances, organized in corporate or other forms of ownership associations with the aid of government authority, have superior economic power in bargaining with employes. This growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions within and between industries, and by depressing the purchasing power of wage earners, thus—

(1) creating sweat-shops with their attendant dangers to the health, peace, and morals of the people; (2) increasing the disparity between production and consumption; and (3) tending to produce and aggravate recurrent business depressions. The denial by some employers of the right of employes to organize and the refusal by employers to accept the procedure of collective bargaining tend to lead to strikes, lock-outs, and other forms of industrial strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health.

"(b) Experience has proved that protection by law of the right of employes to organize and bargain collectively removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between employers and employes."

While these are not absolutely conclusive, merely because the legislature so stated, if they have a substantial relation to an existing evil, they are conclusive.

In the case of Mahon et al. v. Pennsylvania Coal Co., 274 Pa. 489, 497-98, the court, inter alia, said:

"It is not denied on the present record that the conditions above described exist; and the legislature having declared in terms what, in a general way, had become a matter of public notoriety, we must accept such declaration as a correct statement of facts: People, ex rel. Durham Realty Corp., v. La Fetra, 230 N. Y. 429, 440; Lower Vein Coal Co. v. Industrial Bd., 255 U. S. 144. . . .

"That the conditions portrayed in the legislative declaration are such as to create an emergency, properly warranting the exercise of the police power, is sufficiently obvious not to call for extended discussion. It is primarily for the legislature to consider and decide on the fact of a danger, then meet it by a proper remedy".

In the case of Radice v. People of the State of N. Y., 264 U. S. 292, which involved the construction of a statute prohibiting the employment of females over the age of 16 in restaurants for more than six days, or 54 hours a week, Mr. Justice Sutherland said:

"Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question . . . be a fairly debatable one, it is not permissible for the judge to set up his opinion . . . against the opinion of the lawmaker. The state legislature here determined that night employment of the character specified was sufficiently detrimental to the health . . . since we are unable to say that the finding is clearly unfounded, we are precluded from reviewing the legislative determination."

Other cases might be cited, but we regard it as unnecessary to do so.

### Police power

In the case of Commonwealth v. Stofchek, 322 Pa. 513, 519, it was contended that the Pennsylvania Liquor Control Act of November 29, 1933, P. L. 15, infringed guaranties contained in the State Constitution. The court through Chief Justice Kephart said:

"But, the State possesses inherently a broad police power which transcends all other powers of government. There is therefore no unqualified right to acquire, possess, and enjoy property if the exercise of the right is inimical to the fundamental precepts underlying the police power. This court said in *Commonwealth* v. *Widovich*, 295 Pa. 311: 'The police power is the greatest and most powerful attribute of government; upon it the very existence of the State depends . . . if the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail.' It needs no constitutional reservation or

declaration to support it: *City of Scranton* v. *Public Service Commission*, 268 Pa. 172."

In the case of Rohrer v. Milk Control Board, 322 Pa. 257, the Supreme Court, in a comprehensive opinion, reversing the Superior Court and affirming the dissenting opinion written by Keller, P. J., held that the Milk Control Board Law of January 2, 1934, P. L. 174, which regulates the milk industry of the State, is constitutional, and that the said industry under conditions existing today, is of public concern and may, in the public interest, be regulated as a valid exercise of the police power of the State. The Supreme Court, at page 276, said:

". . . 'in order to serve the public welfare, the State, under its police power, may lawfully impose such restrictions upon private rights as, in the wisdom of the legislature, may be deemed expedient; for all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community . . . and a statute enacted for the protection of public health, safety or morals can be set aside by the courts only when it plainly has no real or substantial relation to these subjects or is a palpable invasion of rights secured by the fundamental law; if it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination is conclusive' ".

In the case of Kirmse et al. v. Adler et al., 311 Pa. 78, 84, the court said:

"The right of labor to organize for mutual aid and protection to better their condition in the matter of wages and other incidental benefits, has long been recognized by the courts and legislature of this Commonwealth. See Jefferson & I. Coal Co. v. Marks, 287 Pa. 171, 175. . . . 'Labor unions are therefore not only legitimate but, because their aim and purpose is to better the living conditions of a large part of the body politic, they are a necessary part of the social structure.' "

*Due process*

In the case of Commonwealth v. Funk, 323 Pa. 390, 397-98, the court said:

"If the constitutional provisions of 'due process' and 'judgment of the law' were here applicable they would be fully satisfied by the procedural steps specified in sections 615 and 616 of The Vehicle Code. As we have seen, they require a hearing before the Secretary of Revenue, or his representative. Suspension of the licensee's operating privilege is authorized only when the Secretary finds upon sufficient evidence that the offenses enumerated have been committed. Section 616 allows an appeal to the court of common pleas wherein the licensee resides. The licensee is given an opportunity to be heard and to produce witnesses in his own defense. The whole machinery of the law is available in his behalf. Here, the Secretary of Revenue fulfilled the statutory mandates by holding the hearing and by finding that the appellee had violated the motor vehicle laws of this Commonwealth. The appellee then availed himself of his right to be heard anew by the common pleas court. This system sets up every requirement of due process of law, and an operator whose license has been revoked or suspended cannot complain that he has been arbitrarily deprived of the enjoyment of the privilege. The Supreme Court of the United States, in *Reetz* v. *Michigan*, 188 U. S. 505, 508, held that due process of law is not necessarily judicial process, and said in quoting from *Hurtado* v. *California*, 110 U. S. 516: ' "It follows that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law".' "

In the case of Rohrer v. Milk Control Board, supra, Mr. Justice Keller, in quoting from the case of Nebbia v. New York, 291 U. S. 502, said (pp. 266 to 270):

" 'But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest . . . subject only to constitutional restraint the private right must yield to the public need. The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit government regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. . . . The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. . . . Instances are numerous where valid regulation has restricted the right of contract, while less directly affecting property rights. The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. . . . The function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory . . .' ".

Upon this subject we may also refer to Federal cases. In the case of West Coast Hotel Co. v. Parrish et al., 300 U. S. 379, 391, the court, inter alia, said:

"The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that

deprivation the Constitution does not recognize an absolute and uncontrollable liberty. . . ,. The liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process. . . . 'Freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' "

In the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 42, the court said:

"Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances. The opinion in the case of *Virginian Railway Co.* v. *System Federation, No. 40,* supra [300 U. S. 515, 57 S. Ct. 592] points out that, in the case of carriers, experience has shown that before the amendment, of 1934, of the Railway Labor Act 'when there was no dispute as to the organizations authorized to represent the employees and when there was a willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and

strikes had been avoided.' That, on the other hand, 'a prolific source of dispute had been the maintenance by the railroad of company unions and the denial by railway management of the authority of representatives chosen by their employees.' The opinion in that case also points to the large measure of success of the labor policy embodied in the Railway Labor Act." And at page 33:

"Thus, in its present application, the statute goes no further than to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer.

"That is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to selforganization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reasons for labor organizations. . . . *American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184, 209. We reiterated these views when we had under consideration the Railway Labor Act of 1926. Fully recognizing the legality of collective action on the part of employees in order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace rather than of strife. We said that such collective action would be a mockery if representation were made futile by interference with freedom of choice. Hence the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, 'instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both.' *Texas & N. O. R. Co.* v. *Railway Clerks*, supra. [281 U. S. 548.] We have

reasserted the same principle in sustaining the application of the Railway Labor Act as amended in 1934. *Virginian Railway Co. v. System Federation, No. 40,* supra." See also American Steel Foundries v. Tri-City Central Trades Council et al., 257 U. S. 184.

*Special legislation and classification*

In the case of Findley v. Bryans, 58 Pa. Superior Ct. 399, 401, the court said:

"The true principle, which has been recognized and applied in a multitude of cases, was thus clearly stated in Seabolt v. Commissioners, 187 Pa. 318: 'Legislation for a class distinguished from a general subject is not special but general, and classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. If the distinctions are genuine the courts cannot declare the classification void, though they may not consider it to be on a sound basis. The test is, not wisdom, but good faith in the classification.' "

In the case of West Virginia Pulp & Paper Co. v. Public Service Comm., 61 Pa. Superior Ct. 555, 567, it is said:

"A law is general and uniform if it affect in like manner all persons in the same circumstances. It is not to be understood that to be uniform and general it must operate upon every person in the State. All that is required is that every person brought within the relations provided for it in the statute is within its provisions: Winston v. Moore, 244 Pa. 447; Gottschall v. Campbell, 234 Pa. 347."

And at page 568, it is said:

"It is also objected that the Act of 1913 as amended by the Act of 1915 offends against Sections 6 and 9, of Article I, and Section 8, of Article XVI, securing the right of trial by jury. These provisions apply to proceedings according to the course of the common law and have no reference to new jurisdictions created by statute and

clothed with no common law powers. The purpose was to preserve the trial by jury wherever the common law gave it and in all other cases to let the people through the legislature provide as their judgment might suggest for the orderly administration of justice. Whatever was a subject of jury trial at the date of the Constitution is to remain inviolate but matters which were not at that time subjects of such trial and those arising under subsequent statute prescribing a different proceeding are not included: Van Swartow v. Commonwealth, 24 Pa. 131; Rhines v. Clark, 51 Pa. 96; Wynkoop v. Cooch, 89 Pa. 450; Smith v. Times Publishing Co., 178 Pa. 481."

In a more recent case, Premier Cereal & Beverage Co. v. Pennsylvania Alcohol Permit Board et al., 292 Pa. 127, 133, in which the statute authorizing the right to revoke a permit to manufacture and deal in alcohol was considered, the court said:

"This is not a matter at common law where the Constitution guarantees the right of trial by jury. Such guarantee is, that the right shall remain as heretofore; that is, as it was when the Constitution was adopted. This does not prevent the legislature from providing other tribunals for the adjustment of rights and liabilities subsequently created. See Com. v. Dietz et al., supra; Pottash v. Albany Oil Co., 274 Pa. 384; Fleming's Estate, 265 Pa. 399; Wynkoop v. Cooch, 89 Pa. 450; Rhines v. Clark, 51 Pa. 96, 101; Byers and Davis v. Com., 42 Pa. 89, 94; Banning v. Taylor, 24 Pa. 289. In declaring a new offense the legislature may prescribe a mode of trial other than by jury: Van Swartow v. The Com., 24 Pa. 131."

In the case of Commonwealth v. Funk, supra, the court said (pp. 398-99):

"This question of the delegation of power to an administrative officer was definitely settled by the decision of this Court in *Gima v. Hudson Coal Co.*, 310 Pa. 480. We decided there that while the legislature cannot delegate its power to enact a law, it may make a law which

delegates the power to determine some fact or state of things upon which the law makes its own action depend. See also *Locke's App.*, 72 Pa. 491. Thus the legislature has created, inter alia, the Public Service Commission, the Workmen's Compensation Board, the Board of Moving Picture Censors, and the Liquor Control Board. Similarly, under the federal Constitution administrative boards, such as the Interstate Commerce Commission, have been created. These agencies perform an administrative rather than a legislative or judicial function, their determinations by express statutory provisions being subject to review by the courts. Uniformly the federal Supreme Court has upheld the power of the state to confer discretionary powers upon such administrative officers or boards: *Davis v. Mass.*, 167 U. S. 43; *Wilson v. Eureka City*, 173 U. S. 32; *Gundling v. Chicago*, 177 U. S. 183; *People ex rel. Lieberman v. Van DeCarr*, 199 U. S. 552.

"The decisions of other jurisdictions reach the same conclusion. See *Keck v. Superior Court*, 293 Pac. (Cal.) 128; *People ex rel. Albrecht v. Harnett*, 221 App. Div. 487. In *Tryon v. Willbank*, 234 App. Div. 335, 339 (New York) the Court said: 'While the hearing in such a proceeding [revocation of license] may be said to be quasi judicial, the act of the Commissioner is an administrative and not a judicial one.' The legislature, in enacting The Vehicle Code, has not delegated judicial powers to the Secretary of Revenue in authorizing him to revoke or suspend operators' licenses."

In the case of McCauley v. Imperial Woolen Co. et al., 261 Pa. 312, 326, the court in an opinion written by Mr. Justice Moschzisker said:

"The act permits liberal investigation, by hearing and otherwise; but, after all the data has been gathered without regard to technical rules, then the proofs must be examined, and that which is not evidence within the meaning of the law, must be excluded from consideration; that

is to say, when all the irrelevant and incompetent testimony has been put aside, the findings must rest upon such relevant and competent evidence of sound, probative character as may be left, be this either circumstantial or direct."

The attorneys for appellant place much reliance on the cases of Commonwealth v. Clark, 14 Pa. Superior Ct. 435, Dagostino v. Rogers, 68 Pa. Superior Ct. 284, and Adair v. United States, 208 U. S. 161. In the first of these cases the Superior Court, through Judge Rice in the opinion, writes quite fully in an argumentative way against the principles involved in such legislation as in the instant case, but he leaves it without decision as he says (p. 439) :

". . . as we have not had the benefit of a presentation of an argument on the other side, we feel justified in leaving them with this bare suggestion of their importance, and a reference to some of the general principles of construction to be had in view in the determination of them and like questions."

In Dagostino v. Rogers, supra, the Superior Court says: "The same question was determined in this court in an opinion by President Judge Rice in Com. v. Clark, 14 Pa. Superior Ct. 435, on similar reasoning."

In the last cases, what is there said and relied upon by appellants is not the law as expressed under the subsequent decisions of our appellate courts as is manifest from the cases above referred to.

Wherefore we are of the opinion that the constitutional contentions asserted by appellant cannot be sustained and that the act is constitutional.

We come now to the hearing and the findings and decision of the board.

Section 9 of the Pennsylvania Labor Relations Act, supra, inter alia, provides as follows: "The findings of the board as to the facts, if supported by evidence, shall be conclusive."

In the case of McCauley v. Imperial Woolen Co., supra, the Supreme Court amongst other things has said (p. 326) :

". . . that which is not evidence within the meaning of the law, must be excluded from consideration; that is to say, when all the irrelevant and incompetent testimony has been put aside, the findings must rest upon such relevant and competent evidence of sound, probative character as may be left, be this either circumstantial or direct."

In the recent case of Penna. Labor Relations Board v. Red Star Shoe Repairing Co., Inc., White Star Shoe Repairing Co., Inc., and Tri-Star Shoe Repairing Co., Inc., C. P. 2, D. '37, 4088, 97 L. I. 1203, Lewis, J., amongst other things, said:

"This legislation and the machinery that it provides are unique in the American system, and it is of extreme importance that the board should in the early period of its operation furnish the opportunity for a fair test of the efficacy and wisdom of this type of legislation by acting with utter impartiality as between rival labor unions, as well as between a single labor union and a single employer or group of employers. The board must not permit itself to be the agency or advocate of any particular labor union or labor movement, since the very essence of the act is that the employes shall be free to secede from as well as to join any particular group, and an organization that may today represent a majority of working people in any one craft or shop may tomorrow be superseded by another organization that has enlisted a majority of the persons concerned.

"We regard it as extremely unfortunate that the Pennsylvania Labor Relations Board should have ignored this principle fundamental in the National and State legislation."

In the case of John Bene & Sons, Inc., v. Federal Trade Comm., 299 Fed. 468, the court amongst other things said:

"We are of opinion that evidence or testimony, even though legally incompetent, if of the kind that usually affects fair-minded men in the conduct of their daily and more important affairs, should be received and considered; but it should be fairly done. The Trade Commission, like many other modern administrative legal experiments, is called upon simultaneously to enact the rôles of complainant, jury, judge, and counsel. This multiple impersonation is difficult, and the maintenance of fairness perhaps not easy; but we regard the methods pursued in showing Proper's diminution in sales as lacking in every evidential or testimonial element of value, and opposed to that sense of fairness which is almost instinctive."

In the case of Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U. S. 142, construing identical language in the Federal act, the court said:

"In the case of statutory provisions like §10 (e), applicable to other administrative tribunals, we have refused to review the evidence or weigh the testimony and have declared we will reverse or modify the findings only if clearly improper or not supported by substantial evidence."

In the case of Interstate Commerce Comm. v. Louisville & Nashville R. R. Co., 227 U. S. 88, the court at page 91 said:

"But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our Government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority,

however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power.

"In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi-judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence.'" (Citing many authorities.)

In the case of St. Joseph Stock Yards Co. v. United States et al., 298 U. S. 38, the court said (p. 52):

"Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded."

We have studied the whole of the testimony and concur with the board that the findings nos. 1, 2, 3, 4, 5, 6, 9, 11(a), (b), and (c), are correct. With the rest we cannot agree. There is no evidence that respondent knew of a contemplated organization of a labor union nor is there any evidence that he is opposed to the organization of a union in his plant. On the other hand the evidence without contradiction discloses that in March 1937, Albert Thieme and Arthur Thieme fomented a strike in the plant of respondent, and the latter immediately averted the strike by raising the wages of most, if not all of the

employes. In June 1937, after Ernest Thieme graduated from high school, his uncle, Hugo Thieme, solicited employment for him of respondent, who at that time commented on the fact that there were too many of the Thieme family in the sausage department, but yielded to the request of the uncle, who was foreman of the sausage department. Respondent took a vacation and upon his return in September he was informed by one Fabian, an employe, that Albert and Arthur Thieme were again fomenting a strike (which was not denied), and he thereupon, for that reason, discharged the three Thiemes. There is no evidence whatsoever that he knew of the contemplated organization of a union. He has testified, time and time again, that he did not know of such contemplated organization and it was not for that reason that the discharges were made. Throughout the examination of the witnesses by Breslin, a member of the board, and especially the examination by him of the witness Mitterlehner and others, and by Chairman Lichliter and attorney Hepburn, it is manifest that they were partisan and prejudiced against respondent. It appears that their wish to have the plant unionized was the father of much of their examination. As the act emphasizes, and the authorities above quoted hold, the hearing must be conducted in a fair and impartial manner, with a purpose of rendering a decision which is righteous under the testimony. This record shows that the conduct of the examiners was far from an impartial examination which the law contemplates, and which is the only kind of a proceeding which, upon review, should receive judicial approval. On the other hand, it was the very kind of a proceeding which tends to bring investigations by administrative boards into disrepute. The testimony clearly shows that these men were discharged by respondent for the paramount reason that Albert and Arthur Thieme were fomenting a strike, and, without any knowledge on the respondent's part of the contemplation of a union

organization he discharged them, which he had a right to do.

The respondent's constitutional rights have been invaded.

Wherefore we are of the opinion that the findings of fact, particularly no. 10, and that part of no. 14, quoted, cannot be sustained, but must be reversed. That being so, the decision must be set aside.

### Decree

And now, February 28, 1938, upon due consideration, it is hereby ordered, adjudged, and decreed that the contentions that the act is unconstitutional are overruled and that the act is constitutional; findings no. 10 and part of no. 14, quoted, are overruled and the order of the board is hereby set aside.